. [Crim. No. 587. Third Appellate District.—February 17, 1922.]

## THE PEOPLE, Respondent, v. MICHAEL TOMASOVICH, Appellant.

[1] Criminal Law—Violation of County Liquor Ordinance—Jury —Challenge for Cause—Discretion.—Where, in a prosecution for the violation of a county liquor ordinance, a juror in reply to questions upon his *voir dire* repeatedly stated that, while he entertained a strong feeling of hostility against intoxicating liquors and the traffic therein, he could and would, if accepted as a juror, give the defendant a fair and impartial trial, but upon being questioned at considerable length by counsel for the defendant, he returned an affirmative answer to the question: "As a matter of fact, you do not feel that you can sit in a case of this kind as a fair and impartial juror, do you?" it was entirely within the discretion of the court to determine, upon a consideration of the examination as a whole, whether the juror was or was not subject to a challenge for cause upon the ground of implied bias.

[2] Id.—Evidence—Cross-examination of Witness—Interruption by Court—Discretion not Abused.—In a prosecution for the violation of a county liquor ordinance, it was not an abuse of discretion on the part of the court, in the absence of an objection by the district attorney, to interrupt the cross-examination of a

witness for the people where the questions upon their face called for testimony that was neither relevant nor material to the issue.

[3] ID. — JUGS AND CONTENTS — PROPER FOUNDATION. — Where, in a prosecution for the violation of a county liquor ordinance, it was shown that the jugs containing the whisky alleged to have been sold by the defendant were delivered by the purchaser to the sheriff in the same condition that they were in when received, and that the sheriff immediately placed them in a vault in his office, and kept them locked therein and did not remove them until the time of trial, except on one occasion for analysis of contents, a proper foundation was laid for their admission in evidence.

[4] ID. — IMPROPER REMARK BY COURT — REFERENCE TO FACT AS "PROVED"—EXPLANATION AND INSTRUCTION—LACK OF PREJUDICE. The statement of the court upon the objection to the introduction to the jugs in evidence, that it had been "proven" that they were in the same condition as when delivered to the sheriff, while improper, was not prejudicially erroneous, where the jury was instructed that whether any fact essential to conviction was or was not proved was a matter solely for their determination, and explanation was made by the judge that he intended merely to refer to the testimony in the case and not to what was proved by the testimony.

[5] ID.—REMARK OF COURT TO COUNSEL — ABSENCE OF PREJUDICE.— The statement of the court to defendant's attorney in the colloquy following the making of the remark concerning the proof of the condition of the jugs, "You cannot trap me, sir," was not prejudicial to the defendant, since the misconduct of the court in such a case must be such as to make it manifestly plain that it had brought about a result in the trial which would not otherwise have been effected before a reviewing court, will, solely for that reason, nullify the judgment or the order.

[6] ID.—INTENT—INSTRUCTION.—A clause in an instruction in a prosecution for the violation of a county liquor ordinance that the word "willfully," when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act or make the omission referred to, and it does not require any intent to violate law or to injure another or to acquire any advantage, was not error, since all that it was necessary for the jury to find was that the defendant sold the liquor as charged in the indictment to justify them in arriving at a verdict of guilty.

[7] ID.—REASONABLE DOUBT—INSTRUCTION.—An instruction upon the rule of reasonable doubt that the law "prohibits you from going outside of the evidence to hunt up doubt upon which to acquit the defendant," while objectionable, was not reversible error.

[8] ID.—PLACE OF SALE OF LIQUOR—ERROR IN TAKING JUDICIAL NOTICE —INSTRUCTION—EVIDENCE.—Error in taking judicial notice of the fact that the place where the liquor was sold was not within the limits of an incorporated city in instructing the jury was without prejudice, where the uncontradicted evidence was to that effect.

[9] ID.—ENTICEMENT TO COMMIT CRIME—EVIDENCE—INSTRUCTIONS.— In a prosecution for the violation of a county liquor ordinance, the refusal to instruct the jury that the defendant was enticed upon a design initiated by the officers of the law themselves into the commission of the act of selling the liquor was not error, where the evidence showed that the officers had been informed that the defendant was engaged in the business of bootlegging.

[10] ID.—VENUE OF CRIME—EVIDENCE—APPEAL.—Where, in a prosecution for the violation of a county liquor ordinance, it cannot justly be declared as a matter of law that there was a completed sale of the liquor prior to the delivery thereof in another county, the implied finding of the jury from the circumstances revealed by the evidence that the sale was effected in the county in which the venue was laid is conclusive upon the appellate court.

[11] ID.—COUNTY ORDINANCE—VOLSTEAD ACT—DIFFERENT PENALTIES —VALIDITY OF ORDINANCE.—A county ordinance prohibiting the traffic in alcoholic liquors is not in conflict with the Volstead Act and invalid because the penalty prescribed is in excess or greater than that provided by such act.

[12] COUNTIES—ADOPTION OF LIQUOR ORDINANCES.—Counties in the exercise of the power of police conferred upon them by the state constitution may adopt and enforce ordinances prohibiting the manufacture and sale of intoxicating liquors, and this power has not been taken away from them by the eighteenth amendment to the federal constitution.

APPEAL from a judgment of the Superior Court of Sutter County and from an order denying a new trial. K. S. Mahon, Judge. Affirmed.

The facts are stated in the opinion of the court.

8. Judicial notice of geographical facts, notes, 82 **Am. St. Rep.** 439; 12 **Ann. Cas.** 927.

9. Entrapment to commit crime with view to prosecution therefor, note, 18 **A. L. R.** 146.

11. Construction and effect of the Volstead Act, note, 10 **A. L. R.** 1553.

W. E. Davies for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant, under an indictment returned by the grand jury of the county of Sutter, was tried for and convicted of the violation of certain provisions of an ordinance of the said county penalizing the "sale, manufacture, unlawful possession or transportation of intoxicating liquors" within the limits of said county. Said ordinance, which was introduced in evidence, and which was regularly passed by the board of supervisors of the county of Sutter on the eighth day of March, 1921, is in its provisions fashioned after the law passed by Congress to enforce the inhibition of the eighteenth amendment of the federal constitution against the sale, transportation, and unlawful possession of intoxicating liquors, and known as the "Volstead Act" (41 Stat. 305).

The appeal is from the judgment of conviction and the order denying defendant's motion for a new trial.

The verdict is assailed on a number of different grounds, which may be stated as follows: 1. That there was error, prejudicial to the rights of the accused, in the order denying defendant's challenge of Juror Noyes for cause; 2. That the court, of its own initiative, improperly interfered with and thus curtailed the cross-examination by the defendant's counsel of one of the witnesses for the people; 3. That prejudicial error was committed by the admission of certain evidence; 4. That the court prejudiced the rights of the defendant by making a certain comment upon the testimony during the progress of the trial; 5. That the court erred, to the serious detriment of the rights of the accused, in giving and also in refusing to give certain instructions; 6. That the conviction of the defendant is against public policy and cannot, therefore, be upheld, inasmuch (so it is asserted) as the evidence discloses that the accused would not have committed the act constituting the foundation for his prosecution, conviction, and punishment but for the inducements originated by the public officers themselves and by them held out to him to commit said act; that, in other words, he was trapped into the commission of the

act by said officers; 7. That the evidence is insufficient to support the verdict, in that it was thereby shown that, if any crime at all was committed by the defendant, it was committed within the limits of Butte and not within the limits of Sutter County; and, 8, and lastly, that the ordinance upon which the indictment is based is in conflict with a "general law" and is, consequently, invalid, in that the penalty therein prescribed for the violation of its provisions is in excess of or greater than that prescribed for the same act by the Volstead law.

The specific charge against the defendant is that, on the ninth day of June, 1921, in the said county of Sutter, and outside the limits of any incorporated city or town therein, he sold intoxicating liquors, to wit, "whisky and liquor containing one-half of one per cent and more of alcohol by volume, which was then and there fit for beverage purposes," etc.

From the evidence it appears that, a few months prior to the day on which the defendant was arrested upon the charge stated in the indictment, one M. A. Carpenter had been appointed a deputy sheriff and as such charged with the special duty of "rounding up bootleggers." Carpenter had received information through various sources that the defendant, who resided in Butte County, "about two-tenths of a mile above the Sutter County line," was engaged in bootlegging or in the illicit traffic of intoxicating liquors. After obtaining this information, Carpenter called at defendant's house on several different occasions prior to the date of the arrest, and on one of said occasions—May 21, 1921—in the course of a conversation with the defendant the subject of intoxicating liquors arose and was discussed by and between them. Carpenter asked defendant if he had any wine, to which the former replied: "No, I haven't got any and if I had I would not be afraid to sell it to you. . . . I could get you some jackass brandy." The officer answered that he did not like such liquor, but preferred wine, and ventured the suggestion that he could buy wine at Napa at two dollars a gallon, to which suggestion defendant retorted: "You ought to get some and you can sell it for four dollars a gallon." On another visit of Carpenter to the defendant's home, Carpenter, having taken some wine with him, invited the defendant to take a drink of the

liquor and the latter accepted the invitation, taking two or three drinks. There is, however, no evidence that the wine so drunk by the defendant made him intoxicated or had any perceptible effect upon him. Early in the month of June, 1921, Carpenter, accompanied by another deputy sheriff of Sutter County, named Baker, and one A. A. Laskey, again visited the defendant at his home. These parties took with them three half gallon empty jugs, which they left with the defendant. At this time, it appears, Carpenter and his companions entered into an arrangement with the defendant whereby the latter was to deliver to them, on the ninth day of June, 1921, at a point near "Dago Corners," in Sutter County, the three jugs filled with whisky. The price agreed upon for the liquor was thirty dollars or ten dollars per jug, and Carpenter gave to the defendant the sum of five dollars as in part payment for the whisky. On the day appointed for the delivery of the whisky (the day after the agreement for the purchase of the liquor was made), the defendant, accompanied by his wife and a young son, appeared in his automobile at "Gomez Station," located on the N. E. Railway, in Sutter County, and near ."Dago Corners" at about 8 o'clock in the morning. Carpenter, Laskey, and Baker, in accordance with a prearrangement with the defendant, were at "Gomez Station" at the hour named, having arrived there before the defendant made his appearance at that point. The defendant, upon reaching Gomez Station, saw the officers in an automobile at said station and at the same time the officers saw him, and one of the latter signaled the defendant to follow them. The officers then drove the machine in which they were riding from the highway on to a private road, a short distance from the station and stopped, the defendant following, and upon reaching the point at which the officers had stopped, saying that he had "the stuff" in a suitcase in his machine. Carpenter thereupon stepped to the defendant's automobile and took therefrom the suitcase and handed it to Baker, who removed therefrom the jugs, which were filled with what the defendant then said was "corn whisky," and placed them in their own machine, then returning the suitcase to the defendant. Thereupon the officers paid the defendant the sum of twenty-five dollars, being the balance due for the liquor according to the arrangement

made with the latter at his home the preceding day, Carpenter paying the defendant fifteen dollars and Laskey paying him, by check, ten dollars for the jug of whisky which he (Laskey) was, under the arrangement, to receive. On one occasion on which Carpenter, Baker, and Laskey together visited the defendant's home—whether the day they contracted for the purchase of the whisky or some previous occasion does not appear clear from the record, these three parties having on more than one occasion visited the defendant together—the defendant proposed to sell to the officers a recipe that he claimed to have for making whisky, stating to them that they could make their own whisky "and sell it for twenty-five dollars less than he gave for it." It should also be stated that Carpenter testified that he, Baker, and Laskey had bought liquor of the defendant at his home previously to the day on which the agreement to sell and deliver the liquor at "Gomez Station" was made. And it may further be added that the test made by a pharmacist of the contents of the jugs as they were delivered to the officers by the defendant showed that the liquid therein contained was "corn whisky," which registered "ninety proof" or "forty-five per cent alcohol."

The above statement of facts is gleaned from the testimony of witnesses introduced by the people. As a matter of fact, the defendant did not take the witness-stand in his own behalf, or otherwise introduce any testimony in opposition to that presented by the people in support of the charge.

[1] 1. Juror Noyes, in reply to questions upon his *voir dire* and touching his qualifications to sit as a juror in the case, repeatedly stated to the district attorney and to the court that, while he entertained a strong feeling of hostility against intoxicating liquors and the traffic therein, he, nevertheless, could and would, if accepted as a juror, give the defendant, with whom he was not personally or otherwise acquainted, and as to whom he entertained no feeling of personal prejudice, a fair and impartial trial, according to the evidence adduced and the law as declared to the jury by the court. Upon being questioned at considerable length by the counsel for the defendant, and after repeating that he could try the case fairly and impartially, notwithstanding that he had "always had a very strong prejudice against

liquor," he returned an affirmative answer to this question: "As a matter of fact, you do not feel that you can sit in a case of this kind as a fair and impartial juror, do you?" Thereupon counsel challenged the juror for implied bias as defined by the second subdivision of section 1072 of the Penal Code. The court then questioned Noyes further and brought from him a repetition of the statement he had made to the district attorney that he could try the accused fairly and impartially, and that he would not favor his conviction in the absence of proof of his guilt to a moral certainty and beyond all reasonable doubt. The court denied the challenge, and counsel for the defendant later peremptorily challenged and so excused the juror from sitting in the case. Even if it were necessary to hold that the denial of the challenge was erroneous, it is not shown that, although exhausting his full legal quota of peremptory challenges, the defendant was prejudiced by the order denying the challenge, since it is not made to appear that, by reason of the denial, an objectionable juror was forced upon him. In other words, it is not shown by the record that the defendant "desired to exercise any additional challenge, or that he had the slightest objection to any juror sworn to try the case, or any disposition to have any such juror excused." (*People* v. *Kromphold,* 172 Cal. 512, 520 [157 Pac. 599, 602]; *People* v. *Schafer,* 161 Cal. 573, 577 [119 Pac. 920, 921]; *People* v. *Tinnen,* 49 Cal. App. 18 [192 Pac. 557, 560].) But we think that the examination of the juror was such that it was entirely within the discretion of the court to determine, upon a consideration of said examination as a whole, whether the juror was or was not subject to a challenge for cause upon the ground upon which the challenge was interposed, and the court's determination of that matter in this case is as conclusive upon a reviewing court as is any other question of fact decided at *nisi prius* upon evidence in which there is substantial conflict.

[2]  2. There is no substantial merit in the assignment that the court interfered with and thereby cut off legitimate cross-examination of a witness for the people by defendant's counsel. The incident about which the defendant complains in this particular arose in this way: The witness, Carpenter, was asked by defendant's attorney if he was

not at the request of the district attorney appointed as a deputy sheriff a short time prior to the arrest of the accused, and, before an answer was returned by the witness, the court interrupted to say that the question called for immaterial testimony and that the witness would not be permitted to answer the same. The attorney thereupon stated that he desired "to get down to the approximate date of the appointment," and insisted that he was entitled to have the formal appointment in writing produced in court. The court replied that the appointment was on file in the clerk's office and that counsel could procure and introduce it in the case if he so desired. Subsequently, the same witness, having given as his reason for stopping at the house of the defendant some time during the winter preceding the date of the latter's arrest that the automobile of a party with whom he had no personal acquaintance had broken down near defendant's house and that the owner of said machine desired to ride "to town" with the witness, was asked, on cross-examination, to state to whom said machine belonged, to which question the witness replied that he did not know; that he did not inquire as to whom the machine belonged. Counsel then asked: "It was not your machine?" the witness replying in the negative and again the witness was asked: "What kind of a machine were you driving?" the witness replying that it was a Ford. The court then interrupted this cross-examination with the statement: "That is immaterial. I will stop it. If the district attorney does not object to this line of questions I will myself." The attorney for the defendant did not offer any sound explanation as to the particular purpose he had in view in asking the questions to which the court, *sua sponte,* objected, nor was it shown what, if any, relevancy the testimony thus sought to be elicited would have to the ultimate question to be determined by the jury. Upon their face, the questions called for testimony that was neither relevant nor material to the issue. We cannot perceive wherein the fact, if it were a fact, that the district attorney's request for the appointment of Carpenter as a deputy sheriff would show or tend to show when said appointment was made, which was the only reason counsel gave for asking that question. If the date of the appointment was important, it could easily be shown, as was

later developed, by the introduction of the written appointment itself in evidence. Nor are we able to see that whether the machine which was broken down at defendant's house was that of the witness Carpenter or some other person, a stranger to Carpenter, could shed any light on the issue before the jury. Since the prosecuting attorney failed to object to the examination, as it was his duty to have done, so far as anything to the contrary appears from this record it was not an abuse of discretion or authority on the part of the court to stop an inquiry which could avail nothing but a useless or purposeless consumption of time.

[3] 3. This assignment brings into question the propriety of the action of the court in admitting in evidence and as exhibits against the accused the three half gallon jugs containing the whisky alleged to have been sold by the defendant. The ruling allowing this evidence was over objection by the attorney for the defendant upon the ground that no proper foundation was laid for the evidence, in that it was not shown that the jugs, as they were introduced in evidence, were in the same condition as when delivered to the sheriff by the witness Carpenter. The complaint against this testimony is not supported by the record. The testimony shows that the jugs with their contents were delivered by the witness Carpenter to the sheriff in the same condition that they were in when the witness received the same from the defendant, and that the sheriff immediately placed them in a vault in his office, kept them locked therein, and did not remove them from the time that he received them until the time the trial was called and was proceeded with, save on one occasion when they were taken by the witness Carpenter to a druggist in the city of Marysville for the purpose of having their contents analyzed and tested with the view of determining the character and the extent of the alcoholic content of the liquid contained therein. It is reasonably clear from all the testimony upon this proposition that the contents of the jugs were precisely what they were when sold and delivered to the officers by the defendant.

[4] 4. In connection herewith we may dispose of assignment No. 4, in the order in which the assignments are above enumerated, involving the charge that the court virtually instructed the jury upon a question of fact when

ruling upon the offer of the district attorney to have the jugs with their contents admitted in evidence. The attorney for the defendant, as above stated, objected to the introduction of the jugs in evidence on the ground that a proper foundation had not previously been laid therefor and the court in ruling said: "It has been *proven* that he [witness Carpenter] got them out there in that machine and the sheriff made no change in them, and here he says he delivered them to the sheriff and he said he never made any change in them and the sheriff said they were locked in the cell there and they never made any change." The following colloquy then occurred between court and counsel:

"Mr. Davies: Your Honor said it was proved.

"The Court: That is the testimony before the court.

"Mr. Davies: Did you say it was proved?

"The Court: I said it was the testimony.

"Mr. Davies: I thought your Honor said it was proved.

"The Court: You cannot trap me, sir.

"Mr. Davies: I am not trying to.

"The Court: I advise you not to try it."

Of course, it is not proper for a trial court to state in the presence of a jury during the progress of the trial that any material or important fact has been proved. Such a statement would clearly involve a trespass upon the domain of fact and an invasion of the function of the jury. Undoubtedly, the statement made by the court that the facts referred to were proved was wholly inadvertent and that what the court really intended to say, as it explained was its purpose, was that there was testimony before the jury tending to establish those facts. The explanation of the judge that he intended merely to refer to the testimony in the case and not to what was proved by the testimony, supplemented by the instruction embraced in the charge of the court that whether any fact essential to the conviction of the defendant was or was not proved, was a matter solely for the jury's determination, may well be supposed to have been sufficient to demonstrate to the jury that they were not to be influenced in arriving at a verdict by any chance remark of the court involving what might appear to be a suggestion as to what was proved in the case. The fact is that the explanation of the judge was itself in effect an admonition to the jury that they were not to consider or be influenced in their

deliberations by the remark referred to and assuming, as we certainly may, that the jury was composed of persons of common intelligence, we think they must have heeded such admonition. At any rate, considering the entire record, we do not believe that a miscarriage of justice followed from the making of the remark.

[5] It is further contended, in connection with the present consideration, that the court's statement, in addressing the defendant's attorney, "You cannot trap me, sir," had the effect of placing the attorney in an unfavorable light in the eyes of the jury, with the result that the defendant was likewise prejudiced. The court perhaps should not thus have censured the attorney or insinuated that he was attempting to mislead it, but it too often happens that during the trial of a case, particularly where it is zealously contested by counsel, that both counsel and the court will stray away from that cool and calm mental attitude which should characterize both in the performance of duties of such grave importance, but if cases were to be reversed and sent back for retrial for such a reason there would be very many reversals which would not accord with justice. The misconduct of a court in that particular must be such as to make it manifestly plain that it has brought about a result in the trial which would not otherwise have been effected before a reviewing court will, solely for that reason, nullify the judgment or the order.

[6] 5. The latter clause of the following given instruction is complained of: "The word 'willfully' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act or make the omission referred to. *It does not require any intent to violate law or to injure another or to acquire any advantage.*" This instruction is in the precise language of subdivision 1 of section 7 of the Penal Code. It is contended, however, that said instruction is inconsistent with the instruction, given by the court, that "in every crime there must exist a union of act and intent." In the case of *People v. Stennett,* 51 Cal. App. 370 [197 Pac. 372], the particular language here criticised was under review and it was therein said that said language, although embodied in the code section, would, in the ordinary criminal cases, tend to mislead or confuse the jury and, therefore, should not have been

given. We still adhere to the suggestion so made. But in this case the instruction could not in any view have the effect of confusing the jury or leading to an unjust result; for it is not necessary to the consummation of the crime charged in the indictment in this case that there should exist and be shown an intent to commit the act. All that it was necessary for the jury to find was that the defendant sold the liquor as charged in the indictment to justify them in arriving at a verdict of guilty. (*People* v. *Pera*, 36 Cal. App. 292, 304 [171 Pac. 1091, 1096].) In the case just cited it is said:

"The decisions appear to be quite uniform upon the proposition that where, in invoking and applying the police power, the legislature has prohibited certain acts and denounced them as criminal, the mere commission of such acts, regardless of the intent with which they were committed, is sufficient to constitute the crime so denounced. There are, perhaps, certain exceptions to this rule, as, for instance, where the statute itself uses language in describing or defining the crime indicating that *scienter* or a specific intent to do the act was essential to constitute it a crime. But particularly in cases interdicting the traffic in intoxicating liquors the rule generally is that the mere commission of the act is sufficient to consummate the offense, and in the present case the law authorizing the establishment of 'no-license territories' uses no language indicating an intention in the legislature to make the intent with which the act of keeping a resort for the purpose of selling intoxicating liquors is committed an ingredient of the offense." Citing *Commonwealth* v. *Holstine*, 132 Pa. St. 357 [19 Atl. 273], wherein it is expressly held that to sustain a conviction for selling intoxicating liquors under a statute of the state of Pennsylvania penalizing the sale thereof it is not requisite to prove a criminal intent. These observations, of course, answer the criticism here made against the instruction to the effect that "the commission of the offense constitutes the crime and the specific intent or intention with which it is done is immaterial."

[7] The legal soundness of the instruction read by the court upon the rule of reasonable doubt is challenged upon the ground that therein the court transcended its province by instructing upon a question of fact, in that it was de-

clared in said instruction that the law "prohibits you [the jury] from going outside of the evidence to hunt up doubt upon which to acquit the defendant." An instruction containing precisely the same statement, but otherwise even more vulnerable than the one here complained of, was considered in the case of *People* v. *Del Cerro*, 9 Cal. App. 764, 770 [100 Pac. 887], et seq., and, while the opinion in that case condemned the instruction and cautioned, as the supreme court had repeatedly done previously, trial judges, in instructing on the doctrine of reasonable doubt, to adhere to the statement of that rule as it was given in *Commonwealth* v. *Webster*, 5 Cush. (Mass.) 295 [52 Am. Dec. 711], held upon a careful analysis of the instruction that it was not so far afield in the statement of the rule as to compel a reversal of the case. We refer to the Del Cerro case and others therein cited as a reply to the complaint urged against the instruction under consideration.

[8] The next assignment under this head is that the court erred in taking judicial notice of the fact that the place where the liquor was sold in Sutter County was not within the limits of an incorporated city and so instructing the jury. While the courts take judicial notice of the existence and bounds of a city (Stats. 1889, p. 372; *People* v. *Mueller*, 168 Cal. 521, 524 [L. R. A. 1918B, 788, 143 Pac. 748], it is extremely doubtful whether the courts may take judicial notice of the fact that any particular place or locality is not within the limits of an incorporated city. But there is no evidence in this case or any pretense that either Gomez Station or Dago Corners is situated within the limits of any municipal corporation or that either is itself a municipal corporation. To the contrary, the uncontradicted evidence is that those places were not within the limits of an incorporated city. It is, therefore, manifest that the instruction, even if erroneous, could not have operated prejudicially against the rights of the accused.

[9] The court refused the following instructions requested by the defendant:

"I further instruct you that unless you find that this defendant originated the criminal design of which he is accused and with the criminal attempt to carry out the crime of which he is charged after it was suggested to him you must find him not guilty."

"I further charge you that a person entrapped into the commission of a wrongful act without any original criminal design upon his part, and without any attempt to carry out a criminal purpose of his own conception, does not therefor become guilty of crime."

The foregoing instructions bring up the point assigned as No. 6 in the order in which the points are stated above, to wit, that the defendant was enticed, upon a design initiated by the officers of the law themselves, into the commission of the act of selling the liquor, and that, as a consequence, his conviction and the punishment to follow, if the conviction be sustained, are opposed to public policy.

There are many decisions upon the proposition to which the refused instructions are addressed by both the state and the federal courts, and in many instances the judicial views crystallized from facts substantially similar are rather divergent.

The theory of the rule thus sought to be invoked by the defendant is that it is as well the duty of peace officers to prevent as to detect and punish crime, and that, therefore, where a crime is entirely of the creation of such officers and not that of the person by whose direct act the crime has been committed—that is, where the officers themselves have originated the design to have a crime committed and have by some artful means induced another, wholly innocent of criminal intent until by such officers his mind has thus been corrupted, to execute such design—it is in such case the policy of the law to condemn rather than to encourage convictions thus brought about.

The rule is not, however, uniformly applicable to all cases of crime, but it is unnecessary here to enter into an examination of the reasons for the distinction (they being obvious on reflection), since we are convinced, not only from the evidence but from the nature of the offense charged in the indictment, that the rule cannot be applied in this case. In the first place, it is to be remarked that it is commonly known that everybody of normal intelligence is fully cognizant of the fact that the act constituting the crime charged against the defendant is and has been unlawful ever since the enactment of the congressional legislation, the purpose of which was to enforce the eighteenth amendment to the federal constitution. Indeed, the evidence in this case very

clearly shows that the defendant well knew that the traffic
in alcoholic liquors or the possession thereof not for a pur-
pose allowed by the law was in direct violation, if not of a
county ordinance, of the provisions of the so-called "Vol-
stead Act." His statement to the officer that he would not
be afraid to sell him intoxicating liquor, accompanied by his
offer to sell the officer "jackass brandy," was itself sufficient
to show that he had full knowledge of the wrong involved
in the act of selling such liquor. Also his proposition to
sell the officer a recipe for manufacturing such liquor showed
that he knew that the matter concerning which he was nego-
tiating with the officer, if carried out, would involve a viola-
tion of the law and an act denounced as criminal. The
evidence further shows, as we have seen, that prior to the
first visit of any of the officers to the home of the defendant
the former had received information that the defendant was
engaged in the business of bootlegging and it is a fair and
reasonable inference from all the evidence that the officers
took no steps toward arresting the accused until they had
received such information and then they, as it was their duty
to do, proceeded to make an investigation and to use any
reasonable means for securing evidence against the defend-
ant. The manner in which they prosecuted their investiga-
tion was consistent with the usual legitimate methods adopted
by detectives in ferreting out crime. The fact that the
officers purchased liquor from the defendant does not tend
to show that the defendant was improperly induced or en-
ticed by the officers to commit the crime. If he was engaged
habitually in the unlawful business of dispensing alcoholic
liquors, as the officers appeared to have probable cause for
believing that he was, then it may be said that his purpose
to commit the crime was not the result of anything that the
officers did or said. As was said in *State* v. *Spiker*, 88 Kan.
644 [129 Pac. 195]: The fact that "the purchases of liquor
were made by persons seeking to ascertain if the seller was
engaged in the unlawful sale thereof constitutes no defense
to the charge, nor does it render their testimony incompe-
tent."

[10] 7. The proposition that the evidence is insufficient
to support the verdict involves, it is manifest, a question of
venue or jurisdiction. The contention is that the trans-
action at the defendant's home between the latter and the

officers, in which the arrangement was made for the delivery of the whisky to the officers at the point above indicated in Sutter County, amounted to a completed or absolute sale of the whisky, and that title thereto passed to the officers in Butte County. Of course, if this were true, the venue of the defendant's crime would be in Butte and not in Sutter County.

The testimony does not show just what occurred or precisely what the conversation was at the defendant's house between the latter and the officers on the day preceding that on which the liquor was delivered near Gomez Station. It was shown, however, that the officers visited the defendant at his house on said day; that they left the three empty half gallon jugs with the defendant; that Carpenter paid the former five dollars in cash; that the defendant on the following morning, according to prearrangement, as may well be inferred from the fact that the circumstance occurred at a very early hour in the day, met the officers near Gomez Station and returned to them the jugs filled with whisky and that the balance of the purchase price of the whisky, twenty-five dollars, was paid by the officers to the defendant. From these circumstances, the jury were clearly warranted in finding that the defendant had agreed to sell to the officers three half gallon jugs of whisky for the sum of thirty dollars and was to deliver the same to said officers on the morning following the eighth day of June at or near Gomez Station, in Sutter County. There still remains, though, the question whether the transaction above explained involved a sale or a mere agreement to sell. There was no testimony showing or tending to show that at the time the officers arranged with the defendant for the delivery of the whisky to them at Gomez Station there was any whisky in the possession of the latter at his home. In other words, there is no evidence to show that the defendant had whisky in bulk from which the officers could have purchased or agreed to purchase any quantity of the article. On the other hand, it was shown, as we have seen, that a short time prior to the eighth day of June, 1921, at the home of the defendant, the latter, upon being asked by Carpenter if he (defendant) had any wine for sale, replied that he did not have wine but that he could *get* some "jackass brandy" for the officer, and that the latter said that he did not want that kind of

liquor, from which statement it is to be inferred that the defendant did not keep liquor at his home in stock. Furthermore, the liquor was not measured out and, therefore, the particular whisky proposed to be purchased by the officers was not identified. (Civ. Code, sec. 1140.) And thus, moreover, there is no evidence that at the time the officers delivered the jugs to the defendant the latter had so prepared the liquor or put it in such condition as to make it capable of being delivered. Nor is there any evidence that he offered to deliver it at that time to the officers or otherwise showed any intention of then vesting in them the title thereto. (Civ. Code, sec. 1141.) Indeed, there is no evidence that at the time referred to the officers saw any liquor in the possession of the defendant or had reason to believe that the defendant then had in his possession any liquor from which he could have furnished them that article. It hence appears that there was still something to be done in connection with the whisky proposed to be purchased to put it into a deliverable state or condition.

In Benjamin on Sales, book 2, chapter 3 (7th ed., p. 270), it is said: "Where by the agreement the vendor is to do anything to the goods for the purpose of putting them into that state in which the purchaser is to be bound to accept them, or, as it is sometimes worded, into a deliverable state, the performance of those things shall, in the absence of circumstances indicating a contrary intention, be taken to be a condition precedent to the vesting of the property." Again, the same learned author gives the following rule: "Where anything remains to be done to the goods for the purpose of ascertaining the price, as by weighing, measuring, or testing the goods, where the price is to depend on the quantity or quality of the goods, the performance of these things also shall be a condition precedent to the transfer of the property, although the individual goods be ascertained, and they are in the state in which they ought to be accepted."

It is well settled that the question as to whether the title has passed is one as to the intention of the parties, and such intention is, as a matter of course, to be gathered from the language of the parties considered in the light of all the circumstances of the case. There are, however, certain circumstances which have a controlling force where the intent

is not clearly shown by other evidence or by the express language of the parties to the transaction. In *Blackwood* v. *Cutting Packing Co.,* 76 Cal. 212, 216 [9 Am. St. Rep. 199, 18 Pac. 248, 250], it is said: "If the condition of payment is not waived, the title does not pass until the price is paid (*Peabody* v. *Maguire,* 79 Me. 572, 585 [12 Atl. 630]; *Evansville etc. R. R. Co.* v. *Erwin,* 84 Ind. 457, 464, 465; *Turner* v. *Moore,* 58 Vt. 456 [3 Atl. 467]; *Adams* v. *O'Connor,* 100 Mass. 515 [1 Am. Rep. 137]; *Hoffman* v. *Culver,* 7 Ill. App. 450, 454). It frequently happens that the seller will deliver the goods notwithstanding the failure to fulfill the condition of payment; and in such cases the question arises as to whether such delivery is not to be considered a waiver of the condition. Some courts hold that in the absence of circumstances showing a contrary intention the condition is waived, and that the title passes. But where, as here, there was neither delivery nor payment, there can be no doubt but that the title does not pass. (*Dixon* v. *Duke,* 85 Ind. 435, 436.)"

Again, in the same case, 76 Cal., at page 217 [9 Am. St. Rep. 199, 18 Pac. 251], the court said: "So far as concerns the proposition that where weighing or measuring is necessary *to the identification* of the goods, the title does not pass until they have been weighed or measured, the American cases are generally in accord with the above rule. . . . Some of the American cases are not in accord with the rule laid down by Mr. Benjamin in this: That *if the goods are identified,* it does not matter that weighing or measuring is necessary to ascertain the price or the quantity and this seems to be the law in California for the Civil Code contains the following [here quoting section 1140 of said code]. This section does not dispense with identification. On the contrary, it requires it. It only dispenses with segregation when the property is otherwise identified. Therefore, where the identification consists in the segregation, weighing, or measuring, they are still necessary." (See, also, *Horr* v. *Barker,* 8 Cal. 608; *McLaughlin* v. *Piatti,* 27 Cal. 463; *Caruthers* v. *McGarvey,* 41 Cal. 15; *Gianelli et al.* v. *Globe Grain & Milling Co.,* 48 Cal. App. 103 [191 Pac. 720], and cases therein cited.)

Our conclusion upon this branch of the discussion is that, from all the circumstances of the case, tested by the terms

of the above-named code sections as they are expounded by
our own courts, there can be no doubt that the jury were
warranted in finding that, notwithstanding that Carpenter
paid five dollars cash down at the time that the agreement
was made, the payment of the remaining portion of the
total price of thirty dollars for the whisky was intended as
a condition precedent to the vesting of title, that, therefore,
there was no sale of the liquor effected on the eighth day
of June, 1921, and that, consequently, the venue of the
crime was in Sutter County. In other words, applying to
the evidence the touchstone of the legal principles which
must govern in the solution of the question now before us,
it cannot justly be declared, as a matter of law, that there
was a completed sale of the liquor prior to the delivery
thereof by the defendant to the officers on the morning of
June 9, 1921, at or near Gomez Station in Sutter County,
and, therefore, the implied finding of the jury, from the
circumstances as revealed by the evidence, that the sale was
effected in Sutter County is conclusive upon this court.

[11] 8. The contention that the ordinance under which
the defendant was prosecuted, in so far as the penalty pre-
scribed is concerned, is in conflict with the Volstead Act
and is, therefore, invalid, is conclusively answered by the
recent case of *In re Volpi,* 53 Cal. App. 229 [199 Pac.
1090], decided by this court. It is therein said: "The fact
that the statute or ordinance of the lesser jurisdiction is
more exacting, or that the penalty imposed is more or less
severe than that of the greater, does not constitute a con-
flict. If prosecuted under the one, a defendant is entitled
to the protection which that law affords him; if under the
other, his rights are governed by its provisions. (*In re
Hoffman,* 155 Cal. 114 [132 Am. St. Rep. 75, 99 Pac. 517].)"
[12] Of course, it will be conceded, as is clearly pointed
out by Presiding Justice Finch in the case of *In re Volpi,
supra,* that counties, in the exercise of the power of police
conferred upon them by the state constitution (art. XI,
sec. 11), may adopt and enforce ordinances prohibiting the
manufacture, sale, transportation, or unlawful possession of
intoxicating liquors. This power has not been taken from
them by the eighteenth amendment to the federal consti-
tution, and the fact that the Congress has passed a law for
the enforcement of that provision does not impair the right

of the states to put into action the power of police for the same purpose. Indeed, the eighteenth amendment expressly provides that the federal and state governments shall have concurrent power in the enactment of legislation for the enforcement of its terms and an ordinance of a county designed to accomplish that purpose, whatever the penalty prescribed therein may be, does not conflict with any general law within the meaning of section 11 of article XI of our state constitution merely because the penalty so prescribed is greater than that prescribed by the act of Congress designed for the same purpose.

We have examined this record with much care, and thus we have been persuaded to the conviction, after a painstaking investigation of all the points urged for a reversal, that the verdict should remain undisturbed.

Accordingly, the judgment and the order appealed from are affirmed.

Burnett, J., and Finch, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 17, 1922.

All the Justices concurred, except Sloane, J., and Shurtleff, J., who were absent.

Richards, J., *pro tem.*, was acting for Waste, J., who was absent.