[Crim. No. 6802. Second Dist., Div. Three. Mar. 17, 1960.]

THE PEOPLE, Respondent, v. EDWARD MUZA, Appellant.

Eugene V. McPherson, under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

FORD, J.—The defendant has appealed from a judgment of conviction of the offense of robbery. (Pen. Code, § 211.) Each of the six counts of the information had reference to the same occasion but in each count a different person was named as the one whose personal property was taken. It was alleged with respect to each count that the appellant had been previously convicted in the District Court of the United States, in and for the Western District of Missouri, of the crime of violation

of the Dyer Act, a felony, and that he had served a term of imprisonment therefor in the federal prison, and that he had been previously convicted in the Circuit Court of the State of Missouri, in and for the County of Jackson, of the crime of robbery, a felony, and that he had served a term of imprisonment therefor in the state prison. The appellant entered his plea of not guilty to each of the charges of robbery. He admitted the allegations with respect to the prior convictions except that he raised an issue as to whether, as a matter of law, the first conviction constituted a conviction of a felony. That issue was ultimately resolved against him by the trial court. Upon the trial, the jury found that the appellant was guilty of robbery as charged in count I and determined it to be robbery of the first degree. That count had reference to the taking of property ''from the person, possession and immediate presence of Frank J. Vaca,'' who was the night manager of the premises where the occurrence took place. The appellant was acquitted with respect to the other counts.

The evidence produced by the prosecution as constituting its case in chief will be summarized. At about 10:15 p. m. on July 4, 1958, the appellant entered a store at 1443 West Eleventh Street, Los Angeles. Coffee was served to him by the night manager, Frank J. Vaca. He was observed by the proprietor, Ray W. Booth. After about 10 minutes had elapsed, the appellant left. On the next night, July 5, 1958, at about 10 p. m. the appellant and two other men entered the store but immediately departed therefrom. They returned about 30 minutes later. One of the men, identified at the trial as Bill Holt, had a gun in his hand and said, ''This is a holdup.'' The third man, who also had a gun, guarded the door and saw to it that the several customers went to the back of the store. The appellant was personally unarmed but did say to Holt, ''Give me the gun. I am going to blast the brains out of everybody,'' or words to that effect. Holt refused, saying that he was handling the deal. The men seized cash from the cash register in the amount of about $360 and also took some money order blanks. They took from the proprietor of the store, Ray W. Booth, and the four customers their wallets and the contents thereof.[1]

At the trial, the appellant and Holt were each identified by Mr. Vaca, by Mr. Booth, and by one of the customers, James C. Gould. The other three customers were unable to testify on the subject of identification because of lack of op-

---

[1] Each such act formed the basis of a separate count in the information.

portunity of observation. On cross-examination, Mr. Vaca estimated the height of appellant as being 5 feet, 5 or 6 inches, as he saw him at the time of the robbery.

The defense of appellant was that of an alibi. Two of his brothers, his father, and a friend, residents of Missouri, testified that he was in the state of Missouri on July 4 and 5, 1958. The appellant testified to the same effect and that he had not been in Los Angeles since 1948 or 1949. He further stated that he was 5 feet and 11 inches in height.

In rebuttal, the prosecution called further witnesses. Mrs. Betsy Hudson, lessee of the Hudson Hotel which was located at 119 Pier Avenue, Ocean Park, California, testified that a Mr. and Mrs. B. B. Holt and an Edward Muza had registered at her hotel on June 30, 1958. She identified the appellant and Holt (who was present in the courtroom) as the two men she had seen at her hotel. She particularly remembered them because Holt had dyed his hair while there from a light color to red. In doing so, he had stained certain linens which caused Mrs. Hudson to tell the Holts to move. Her clerk, William Panos, testified that he recognized the appellant and Holt as being the men who had registered in his presence at the hotel on June 30, 1958, and who had checked out on July 1, 1958. Another witness, Abe Goldman, who was the proprietor of the Metropole Hotel, located at 145 Pier Avenue, testified that on June 29, 1958, at about 2 a. m., two men and a woman registered at his hotel and were gone when he awoke in the morning. Mr. Goldman recognized Holt as one of the men but testified that he had not seen the appellant before he, the witness, had come into court. Two handwriting experts, Don M. Mire and Lawrence W. Sloan, were called by the People. Each testified that it was his opinion that the signatures ''Edward Muza'' made in the records of the two hotels were written by one and the same person. It was their qualified opinion, after a comparison of the hotel-registration signatures with handwriting exemplars of the appellant which were obtained after his arrest, that the registrations and exemplars were all written by the same person.

The appellant thereafter resumed the witness stand and denied that he had ever registered at any hotel with the Holts but stated that he had associated with them in Kansas City, Missouri. He had seen Holt in the Missouri State Penitentiary.

The acquittal of the appellant with respect to the charges contained in the counts other than count I does not, in and of itself, affect the validity of the conviction under count I.

As stated in *People* v. *Villa,* 156 Cal.App.2d 128, at page 133 [318 P.2d 828]: "Section 954 of the Penal Code provides, in its last sentence: 'An acquittal of one or more counts shall not be deemed an acquittal of any other count.' Under this section, each count charging a separate and distinct offense must stand or fall on its own merits. The disposition of one count has no effect or bearing upon the other counts. This is so even though the respective verdicts in the various counts may be logically inconsistent. (*People* v. *McCree,* 128 Cal.App.2d 196 [275 P.2d 95]; *People* v. *Codina,* 30 Cal.2d 356 [181 P.2d 881]; *People* v. *Ranney,* 123 Cal. App. 403 [11 P.2d 405].)" In *People* v. *Horowitz,* 131 Cal. App.Supp. 791, at pages 793-794 [19 P.2d 874], Judge Bishop quite aptly suggests that inconsistent verdicts "may be caused not by the confusion but the mercy of the jury, of which the appellant can neither complain or gain further advantage." (See also *People* v. *Amick,* 20 Cal.2d 247, 252 [125 P.2d 25]; *People* v. *Simpson,* 87 Cal.App.2d 359, 362 [196 P.2d 933]; *People* v. *Hernandez,* 100 Cal.App.2d 128, 133 [223 P.2d 71].)

A serious problem is presented by the contention of the appellant that the fairness of the trial was prejudicially affected by the comments made by the trial judge to the jury shortly before the verdicts were reached. That the evidence as to the identity of the appellant as a participant in the robbery was in conflict is apparent from the summary of the evidence which has been given. The experts had each expressed a qualified rather than a positive opinion that the handwriting in the hotel records was that of appellant. The trial had commenced on March 18, 1959, and was in progress on March 19 and 20 and then was continued to March 23. On the latter date, the parties completed the introduction of evidence and the case was continued to March 25. On March 25, the arguments to the jury were completed and the jury was instructed before noon. The jury retired to deliberate at 11:55 a. m., went to lunch and then resumed its deliberation at 1:45 p. m. About 4:20 p. m., the jury was returned to the courtroom. Upon inquiry from the court, the foreman stated that two ballots had been taken and that "we have a three-way split here." He further stated that he did not know whether a verdict could be reached if further deliberations were had. Thereafter the jury was sent to a hotel for the night. On the morning of March 26, the jury resumed its deliberations. At 9:20 a. m., upon its request the jury came back into the courtroom and the testimony of Mr.

Gould and a portion of the testimony of a handwriting expert was read. The jury retired at 9:45 a. m. but at 10:35 a. m. it returned to the courtroom, certain testimony was read, and it retired again at 10:50 a. m. At 4:10 p. m., the jury was brought back into the courtroom and the foreman, upon inquiry by the court, stated that the jurors stood seven to five. The following then occurred: "THE COURT: I see. Well, this case took about a week to try and the way I figure it, you have had about six hours' actual deliberation, so you will have to go to a hotel again tonight. THE FOREMAN: We have voted six times today and it has been the same thing. THE COURT: Well, there are six counts too. As I advised you, it is in the interest of justice both to the defendant and the People that a verdict be arrived at if at all possible. Now this thing has been continued over a week and two days isn't too long to deliberate. You will go to the hotel."

On Friday, March 27, 1959, which was Good Friday, the jury resumed its deliberations at 8:30 a. m. At 9:15 a. m., it was returned into court. At the beginning of that session, the court stated: "I understand there is some question in your minds with respect to what action you can take on the several counts; in other words, there are six counts here arising out of a single transaction. Now, again, as in all instructions, I must admonish you, in instructing you, I am not indicating in any way what I think you should do or anything else. It is simply to clarify what I believe to be a question in your minds. . . .[2] Again, may I admonish you that any explanation I may have made is not any indication to you—it is simply an explanation."

Then, in response to a request of a juror, which was, "Would you clarify for each juror the question of armed," the court made statements, portions of which appellant contends were prejudicially erroneous. Such statements were: "THE COURT: Well, I will instruct you as a matter of law that the defendant himself was not personally armed. As to 'armed', there is a distinction in the law. For example, there is one instruction that tells you if one person is armed they are all armed. Now, again, I am not telling you what I believe in this matter; the evidence indicates that the two other men were armed but strongly indicates that he was not armed. Now, the distinction is this. Where a man engages in a robbery and he himself is not personally armed and the court and jury so find, the only differential is, in that in-

---

[2]The explanation then given is here omitted.

stance, he can be granted probation, whereas the other men cannot. Now that is it. You are not to consider penalty so you will understand why the difference. I am explaining that. Believe me, don't consider penalty because penalty is something you have nothing to do with and I think the instructions unfortunately say, in effect, it is none of your business and you should not consider in these cases penalty and punishment, or probation. . . . I could tell you, very sincerely, if you happen to find this man guilty, I couldn't tell you from where I sit, just exactly what I would do and that is the reason for this rule that you shouldn't consider penalty. The statute will say one to ten years[3] but whether some other conditions, some other things, come into effect, and even though some things are there, I, as a judge, have the power to strike those things to enable me to give a man probation. . . . Now the only distinction here in this case is if you find that the other two were armed, and, again, I am not indicating what you should find, but, if you do, the only difference is whether or not he, himself, was personally armed. Well, now, I will instruct you, as a matter of law, he was not because there is no evidence that he had a gun in his hand at any time and the only evidence I recollect is that he may have at some time or other made some request to get the gun from the other men who had it. That is all there is so while he was armed in the sense of being armed, he was not personally armed and, if you came out with a verdict otherwise, why I would change it because I would have to.''

A juror then asked, ''Would you explain that question of 'armed'?'' The court stated: ''Well, as you were heretofore instructed, I instruct you if one is armed, they are all armed. Now, if you decide that both of those other men were armed, or one man was armed, they were all armed and your finding should be that he was armed. Then the other distinction comes into play, as I tell you, whether or not he was personally armed. That is just the reason that I tell you, you are not to consider penalty because you have no way of knowing and it is very natural for people to get up there and say, well, he has got so many years to do, but if they could be made to realize that they don't know what they are talking about, but I

---

[3] The trial judge was apparently not specifically referring to robbery, although jurors may have assumed that he was. Section 213 of the Penal Code provides: ''Robbery is punishable by imprisonment in the state prison as follows: 1. Robbery in the first degree, for not less than five years. 2. Robbery in the second degree, for not less than one year.''

shouldn't tell you that, but actually that is it. Well, I know one of our older judges, a man who is now dead, and probably one of the greatest judges of law and evidence, whenever he had this occur and he had found a man had had three or four terms in prison, he said maybe he should give them a break and give them another chance, and so that is what he would do, and that was his feeling. I just tell you that to show you the wide discretion that a judge has. Of course, we have been sternly criticized by some Appellate Courts for some of the things we do, but, again, I feel we are justified and we do have a wide discretion. I hope I haven't committed an error in telling you all of that.''

Thereafter, a juror asked, ''Do we have to find him guilty in the first degree or could we make it different degrees than first degree?'' The court then answered: ''Well, automatically, the statute says that if a man is armed, it is armed robbery and there is nothing you can do, and it is first degree. But again the same distinction comes in and the statute also says you can go further in that matter. If it is an armed robbery, no probation. Now, most every judge follows that to the letter, however, if one individual is not and the statute says he himself is personally armed, it is a little redundant, I think, and they can grant probation if some other conditions obtain but that is something I will have to determine. That is my burden.''

Counsel for appellant then noted his objection at the bench as follows: ''MR. BARNETT: If the Court please, I didn't want to interrupt you in front of the jury, but the remarks that were made were prejudicial against the defendant in this matter, and I didn't want to make it any more so by objecting to the remarks and asking you to strike them, and admonishing the jury, but I feel in this case that in the colloquy you had with the jury that you have committed prejudicial error and I would object to the statements and ask that a mistrial be granted. I believe you stated definitely, unequivocally that the defendant was not armed; in fact, he was not there. You also said in the discussion on the question of probation and penalty, you implied that in some cases armed robbery got State Prison but may not if they are not personally armed, and if he were found guilty, you might be inclined to be more lenient as to penalty.'' The motion for a mistrial was denied. At that point the court stated to the jurors: ''There is one point I want to clarify. When I said he was armed, that is if you were of the opinion that he was there, and I was just

using that as an expression—if you find, however, if he was there, whether he was armed or not armed. That is the point 1 wanted to make.''

At 9:35 a.m. the jury retired to deliberate further. At 10:05 a.m., the jurors came back into the courtroom and certain expert testimony relating to handwriting was read to them. Before they retired again at 10:16 a.m., the court said: ''In all this explanation that I am giving to you, please believe me that I am not saying what you should do or what I believe you should do with respect to this defendant. I am simply trying to tell you that these are, well, they all arise out of the same transaction so far as you are concerned. There are six separate verdicts and you can treat them accordingly. Does that take care of it?'' At about 11 a.m.,[4] the jury returned with its verdict of guilty as to count I and its verdicts of not guilty as to the remaining counts.

█ The guiding principle in the solution of the problem thus presented is set forth in *People* v. *Crowley*, 101 Cal.App. 2d 71, at page 75 [224 P.2d 748]: ''It is well settled that a conviction will not be allowed to stand if the court has made remarks to the jurors which might reasonably be interpreted as indicating the court's belief of the guilt of the accused, and if it also appears upon the entire record that the infringement upon the rights of the defendant resulted in a miscarriage of justice. Under our system of law no reviewing court could hold otherwise. These questions must be answered on the factual basis of the individual case.''

█ The first phase of the contention of appellant is addressed to the question of whether the trial judge improperly assumed the guilt of appellant in his statements to the jurors. While the judge's power of comment on the evidence for the purpose of aiding the jurors in their deliberations is broad, it is not unlimited and cannot go so far as to withdraw material evidence from the jury's consideration. (*People* v. *Friend*, 50 Cal.2d 570, 577 [327 P.2d 97]; *People* v. *Ottey*, 5 Cal.2d 714, 728 [56 P.2d 193].) In assuming the presence of the appellant at the scene of the robbery in his comments, the trial judge in effect withdrew from the jurors the matter of alibi. Thus, as noted above, he stated: ''Now, again, I am not telling you what I believe in this matter; *the evidence indicates that the two other men were armed but strongly indi-*

---

[4]The exact time cannot be determined from the record since the minutes of the court and the reporter's transcript appear to be in conflict as to the matter.

*cates that he was not armed.''* (Emphasis added.) And again: ''Now the only distinction here in this case is if you find that the other two were armed, and, again, I am not indicating what you should find, but, if you do, the only difference is whether or not he, himself, was personally armed. Well, now, I will instruct you, as a matter of law, he was not because there is no evidence that he had a gun in his hand at any time and the only evidence I recollect is that he may have at some time or other made some request to get the gun from the other men who had it. That is all there is so while he was armed in the sense of being armed, he was not personally armed and, if you came out with a verdict otherwise, why I would change it because I would have to. . . . Well, as you were heretofore instructed, I instruct you if one is armed, they are all armed. Now, if you decide that both of those other men were armed, or one man was armed, they were all armed and your finding should be that he was armed.''

It is true that the trial court prefaced his comments on March 27 with the statement, ''Now, again, as in all instructions, I must admonish you, in instructing you, I am not indicating in any way what I think you should do or anything else. It is simply to clarify what I believe to be a question in your minds.'' But that comment was followed by a statement which related to the question of the jurors with respect to what action they could take as to the several counts which arose out of the same transaction.[5] It was thereafter that a juror asked for clarification as to the question of ''armed.'' It is further true that after the motion for mistrial was made at the bench and denied, the court stated: ''There is one point I want to clarify. When I said he was armed, that is if you were of the opinion that he was there, and I was just using that as an expression—if you find, however, if he was there, whether he was armed or not armed. That is the point I wanted to make.'' But it is difficult to reach the conclusion that the

---

[5]As to that matter, the court stated: ''. . . but where you have several counts, as you have here, it is your judgment what you do with respect to each of the counts considering it as a separate offense; in other words, you can find a person guilty on one count and not guilty on another; you can find them guilty on two or three or you can find him not guilty on one or all six, or guilty on one or all six, or you can find him not guilty or innocent on any one or several, or disagree on all others or disagree on any number of the others, and that is the situation, as I say, so far as your action is concerned with respect to what you can do when we have six counts of this type. Again, may I admonish you that any explanation I may have made is not any indication to you—it is simply an explanation.''

harm done by the unqualified assumption of the presence of the appellant at the scene of the crime was adequately eliminated by the cautionary statement made as an afterthought. It is true that the question asked of the court was only pertinent if the jury first found that the appellant participated in the robbery. But the difficulty is that apparently some jurors had not reached that conclusion because, when they were sent to the hotel on the previous evening, they then stood seven to five on the issue of guilt and because, after the court's remarks and the denial of the motion for a mistrial, inquiry was made by several jurors with respect to the expert testimony on handwriting and thereafter a portion of such testimony was read to the jury. Such testimony, of course, related to the issue of alibi. "It is common knowledge that jurors are most anxious to ascertain, if possible, the ideas of the judge upon the bench during the trial of causes." (*People* v. *Pokrajac*, 206 Cal. 259, 262 [274 P. 63] ; see also *People* v. *Aragon*, 154 Cal.App.2d 646, 661 [316 P.2d 370].) "They are quick to perceive a leaning of the court. Every remark dropped by the judge, every act done by him during the progress of the trial is the subject of comment and conclusion by the jurors. . . ." (*People* v. *Zammora*, 66 Cal.App.2d 166, 210 [152 P.2d 180].) But even though the conclusion be reached that the comments bearing on the presence of the defendant at the scene of the crime did not, under the circumstances, constitute prejudicial error in and of themselves (*cf. People* v. *Tomasovich*, 56 Cal. App. 520, 530 [206 P. 119] ; *People* v. *Anderson*, 75 Cal.App. 365, 377 [242 P. 906]), they must be considered together with the comments relating to punishment which give rise to the other phase of appellant's contention, a matter to which we now turn.

The trial court unnecessarily discussed with the jury the problems which are presented to a judge at the time when sentence is imposed in a criminal case. While he stated that "if you happen to find this man guilty, I couldn't tell you from where I sit, just exactly what I would do and that is the reason for this rule that you shouldn't consider penalty," his comments were sufficient to suggest to the jurors that he might find a way to extend leniency to the appellant if he were found guilty. In *People* v. *Covey*, 137 Cal.App. 517 [30 P.2d 1010], after the jury had been deliberating for nearly 30 hours, the jurors were brought back into the courtroom. In answer to their inquiry as to whether a recommendation for probation would be recognized in the event they returned a

verdict of manslaughter, the court stated that "the recommendation of the jury for mercy or anything of that kind is always given great weight by those in authority who are to fix the punishment." Within half an hour thereafter a verdict of manslaughter was returned which contained the added words, "and the jury recommends probation." The defendant was not eligible for probation. On appeal, the defendant contended that the statement of the court caused the jury to reach a compromise verdict. In reversing the judgment, the appellate court said, at page 521: "The clear import of this colloquy is an assurance by the court that if the jury rendered a verdict of manslaughter with a recommendation of probation, the granting of probation would be 'discretionary with the court,' with the suggestion that the court was uncertain 'in this particular crime whether (the recommendation) would be carried out.' But the court clearly encouraged the jury to believe that it would be granted for he afterward says: 'It is discretionary with the court what he shall do with that recommendation. The recommendation of the jury for mercy or anything of that kind is always given great weight by those in authority.' It is immaterial whether this language inferred that the court or the prison board would give the recommendation great weight. It is in direct violation of the statute for any tribunal to grant probation under the circumstances of this case. The jury should have been instructed that its only duty was to determine the guilt or innocence of the accused, and that under no circumstances had it the right to take into consideration the penalty which might be imposed in the event of conviction." In its opinion (pp. 523-524), the court distinguishes *People* v. *Bruno*, 49 Cal.App. 372 [193 P. 511], in that in the Bruno case, while the trial judge did explain to the jury "the extent of the punishment that might be imposed" under the various forms of verdict, there was no indication that a recommendation for clemency or probation would be granted or considered by the court. Moreover, in the Bruno case probation might properly have been granted, although the jury did in fact make no recommendation for probation or clemency.

*People* v. *Smith*, 206 Cal. 235 [273 P. 789], was a case in which the defendant, if found guilty, was ineligible for probation because the charge involved the embezzlement of public funds. The jury was instructed that while restoration of embezzled funds, or tender thereof, was not a ground of defense, "it authorizes the court to mitigate the punishment in

its discretion.'' The verdict returned contained a recommendation of probation. In reversing the judgment, the Supreme Court said, at pages 238-239 : ''The vice in the instruction here complained of is that the intimation or promise extended to the jury that leniency in the punishment might be extended to the defendant by the court, had a tendency to draw the attention of the jury away from the evidence and overcome reasonable doubt and thus to induce the jury to reach a verdict on ulterior considerations. On the facts in this case the jury might have entertained a reasonable doubt as to the existence of all the necessary elements of the felony charged against the defendant and acquitted him but for the erroneous instruction. Under these circumstances the saving clause of the constitution (art. VI, § 4½), may not operate on the judgment of conviction and it should be reversed. The fact that the court further instructed the jury that the question of punishment is left wholly to the court did not cure the error. It may not be said to have effaced from the minds of the jury the hope and expectation that the court in the exercise of its powers might extend leniency to the defendant.''

It is true that in the present case no recommendation for leniency was made by the jury. It is further true that errors of the nature discussed are not necessarily prejudicial. (See *People* v. *Marquis*, 153 Cal.App.2d 553, 559 [315 P.2d 57].) But each case must be viewed in the light of its own circumstances. The posture of appellant's case at the time the comments were made of which appellant complains was such that it can be said that the intimation that leniency in punishment might be extended to the appellant by the court had a tendency to draw the attention of the jury away from a consideration of the defense of alibi and overcome reasonable doubt on the part of some jurors.

If the comments of which complaint is made were such as to bring to bear in some serious degree, although not measurable with any precision, an improper influence on the jury, the conclusion cannot be avoided that the trial court committed prejudicial error. That is the case here. The Supreme Court, in *People* v. *Sarazzawski,* 27 Cal.2d 7 [161 P.2d 934], has emphasized that the preservation of the concept of a fair trial is essential in the administration of justice. It said, at page 11 : ''At least two of such incidents are matters of such grave moment as to amount to substantial departures from the established elements of a fair trial, to which every person charged with crime, no matter how rich or poor, virtuous or

debased, is entitled. When a defendant has been denied any essential element of a fair trial or due process, even the broad saving provisions of section 4½ of article VI of our state Constitution cannot remedy the vice and the judgment cannot stand. (*People* v. *Mahoney*, 201 Cal. 618, 627 [258 P. 607]; *People* v. *Adams*, 76 Cal.App. 178, 186-187 [244 P. 106]; *People* v. *Gilliland*, 39 Cal.App.2d 250, 264 [103 P.2d 179]; *People* v. *Duvernay*, 43 Cal.App.2d 823, 829 [111 P.2d 659].)

That section was not designed to 'abrogate the guaranties accorded persons accused of crime by other parts of the same constitution or to overthrow all statutory rules of procedure and evidence in criminal cases. When we speak of administering "justice" in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected.' (*People* v. *O'Bryan*, 165 Cal. 55, 65 [130 P. 1042], opinion of Mr. Justice Sloss; *People* v. *Wilson*, 23 Cal.App. 513, 524 [138 P. 971].)"

While we cannot say from the record that there would probably have been an acquittal on all counts had the comments not been made, we cannot say that in such case there would have been any verdict at all on count I. A miscarriage of justice is apparent because it is reasonably probable that a result more favorable to the appellant would have been reached in the absence of the erroneous comments. (See *People* v. *Watson*, 46 Cal.2d 818, 834-837 [299 P.2d 243].) Accordingly, the duty of this court is to reverse the judgment. (*People* v. *Baumgartner,* 166 Cal.App.2d 103, 108 [332 P.2d 366]; *People* v. *Smittcamp*, 70 Cal.App.2d 741, 754 [161 P.2d 983]; *People* v. *Flores*, 37 Cal.App.2d 282, 288 [99 P.2d 326].)

The judgment is reversed; the cause is remanded for a new trial.

Shinn, P. J., and Vallée, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 11, 1960.