[Civ. No. 5414. First Appellate District, Division Two.—December 12, 1925.]

In the Matter of the Estate of SEM NEWELL, Deceased. FRANCIS E. NEWELL, Appellant, v. JOSEPH L. NEWELL, Respondent.

[1] WILLS—CONTESTS—PROOF OF WILL—SUFFICIENCY OF EVIDENCE.— In this proceeding to contest a holographic will before probate, the fact that the proponent did not formally state that he offered the will in evidence, and did not formally read the will, did not render the record vulnerable to the attack on appeal "that no will was before the court as evidence; and no will was introduced in evidence; no will was offered in evidence; and no will was even marked for identification," and that there was an entire absence of even a *prima facie* case warranting the admission of the will to probate, in the absence of any objection, motion, or exception showing that the point was in any way called to the attention of the trial court, and the record discloses that in the subsequent proceedings the trial court and both attorneys were laboring under the impression that the will had been formally admitted in evidence and each was fully informed as to what was meant by the expression "the will."

[2] ID.—IDENTIFICATION OF WILL—SUFFICIENCY OF EVIDENCE.—In such contest the evidence was sufficient to identify the will.

[3] ID.—HANDWRITING OF TESTATOR — EVIDENCE — QUALIFICATIONS OF WITNESS.—In such contest, the objection on appeal that the evidence does not show that the proponent was qualified to state whether the writing on the face of the will was that of the deceased is sufficiently answered by the fact that the witness was allowed to answer without any objection that it was.

[4] ID.—HANDWRITING EXPERTS — BANK OFFICERS — WITNESSES. — In such contest, the trial court properly admitted the testimony of certain witnesses who were bank officers, and as such were qualified experts on handwriting, to support the testimony of the proponent that the will was entirely in the handwriting of the testator.

[5] EVIDENCE — HANDWRITING EXPERTS — QUALIFICATIONS. — In order that a witness may be competent as an expert on handwriting, it

1. See 2 Cal. Jur. 248.
3. See 2 Cal. Jur. 263.
4. See 10 Cal. Jur. 1006.
5. See 10 Cal. Jur. 1006; 11 R. C. L. 621.

is not necessary that he should belong to any particular calling or profession, it being only necessary that the business opportunities and intelligence of the witness should be such as to enable him to have reasonable skill in judging of handwriting; but while it is not necessary that the witness should have made the comparison of handwriting a specialty, it should appear that he has been engaged in some business which calls for frequent comparisons, and that he has in fact been in the habit for a length of time of making such comparisons.

[6] APPEAL—WILL CONTEST—EXECUTION OF WILL—FINDINGS.—In a will contest, where there is direct testimony in the record that the deceased signed the will, the appellate court, upon an appeal under section 953a of the Code of Civil Procedure, cannot disturb the findings of the trial court to that effect, and will not order exhibits certified to it in order to make comparison of deceased's handwriting.

(1) 40 Cyc., p. 1352, n. 15, 18.    (2) 40 Cyc., p. 1300, n. 33.    (3) 3 C. J., p. 807, n. 88, p. 808, n. 91; 40 Cyc., p. 1352, n. 18.    (4) 22 C. J., p. 523, n. 92.    (5) 22 C. J., p. 780, n. 66, 67, 68, 70.    (6) 40 Cyc., p. 1361, n. 90.

APPEAL from a judgment of the Superior Court of Sonoma County. R. L. Thompson, Judge. Affirmed.

The facts are stated in the opinion of the court.

E. J. Dole for Appellant.

L. E. Fulwider for Respondent.

STURTEVANT, J.—This is a proceeding to contest a will before probate. The proceeding was heard before the trial court sitting without a jury. The trial court made findings in favor of the proponent and thereafter ordered judgment in accordance therewith. From that judgment the contestant has appealed under section 953a of the Code of Civil Procedure.

[1] The first point made by the appellant is "that no will was before the court as evidence; no will was introduced in evidence; no will was offered in evidence; and no will was even marked for identification. That there is an entire absence of even a *prima facie* case warranting the admission of the will to probate." The point rests upon

the fact that the proponent did not formally state that he offered the will in evidence and he did not formally read the will, nevertheless we think that the record is not vulnerable to the attack made by the appellant. The appellant does not call to our attention any objection, motion, or exception showing that the point was in any way called to the attention of the trial court. On the calling of the case the proponent commenced to introduce a *prima facie* case proving his petition for the probate of the will. He called as a witness the proponent and having elicited other jurisdictional facts the attorney for the proponent asked the witness, "Did your father leave a will? A. He did. Q. I will show you this, and ask you if that will is entirely written, dated and signed by the hands of your father? (Showing.) A. The will is written entirely and dated by my father and states it is his only will." On cross-examination the attorney for the contestant propounded the question, "Now you said in your examination by Mr. Fulwider that when your father made the will he stated that it was his only will and the last handwriting he would ever do. A. That is right. Q. Were you present when he was writing this? A. No, sir, he told me about it the day after he made it. Q. How do you place the time as the day after it was made? A. Because he said, 'I made my will yesterday before noon and I placed it in the bible, and I want no man to move it, it is in a place where it should be held inviolate until I am dead.' Q. And is that where you found it? A. Yes, sir. Q. After his death? A. While he was unconscious. Q. You got it before he died, though? A. I got it to make a copy of it, and placed it in the same place it was, so if it was removed I would know what the will was and it would be a protection to me. Q. Then you had a copy of the will before he died? A. Yes after he was unconscious. Q. Where is that copy you made? A. Mr. Fulwider has it. Q. I would like to see that. (Mr. Hall examines paper.) Where did you make this copy? A. I made it on the same desk which contains the book he wrote it on. Q. When did you make this copy? A. Well I made it in the kitchen, or the bedroom which was formerly the kitchen where he laid." Later the contestant offered the copy in evidence. The court ordered it received and considered read. The copy so received is as follows:

"Copy.	May 9th, 1919

"In the name of God, amen this is my last Will will I hereby leave all my real and personal property to my son J. L. Newell if he should di before I do then it shall go to my brother's children share and share alike $5 goes to my son F. E. Newell

"Signed by Father

"Copied by J. L. Newell."

(Endorsed in ink:) "Copy of Will."

The clerk's transcript sets forth the petition for probate of will and shows that the same was filed April 21, 1924. And immediately following the same transcript contains the will and shows it was filed April 21, 1924. We have carefully examined the record and do not find any place in which the appellant claimed that the copy received in evidence was not a true and correct copy. The witness in the chair in numerous places testified that it was. As the witness was leaving the stand the trial court asked the attorney for the proponent if that was his *prima facie* case. After a discussion in which the attorney for the proponent, the attorney for the contestant and the trial court participated, regarding the evidence as to proof of notice, etc., the attorney for the proponent stated: "That is our *prima facie* showing. The Court: You may proceed then." Thereupon the contestant proceeded to introduce proof of the allegations contained in the written contest. From that point on to the end of the case each attorney at different times referred to the will and asked questions of various witnesses in the same manner and to the same extent as though the original will had been formally read in evidence. Furthermore, after the contestant had introduced his evidence and after the proponent had introduced his evidence and had rested, the contestant called as a witness Mr. R. A. Belden and after propounding questions and developing the facts that Mr. Belden was a banker of twenty-three years' experience and had acted in every capacity of the banking business and had occasion, as a banker, to compare signatures of various parties, the contestant then propounded the following question: "Q. I show you here a document which is Contestant's Exhibit One. That is the original will as

filed in the clerk's office, that is the original will and I show you here on page 227 a signature, and ask you to compare them." Now, as a matter of fact, contestant's exhibit one was not and did not purport to be the will or a copy of the will, but it was an agreement of hire dated March 19, 1920, as appears on page 16 of the transcript. Be that as it may, the record fully discloses that both attorneys and the trial court were laboring under the impression that the will had been formally admitted in evidence and each was fully informed as to what was meant by the expression "the will." No one at any time in any place contended or suggested that there were two or more papers purporting to be wills. Under these circumstances we think that the first point made by the appellant is entirely without merit.

[2] The second point made by the appellant is, "So far as there was any identification of a will, it was a different document from that admitted to probate." Supporting this point appellant first quotes the will, then he quotes that part of the testimony printed above where the witness made the answer, "The will is written entirely and dated by my father and states it is his only will." Counsel then argues that as the will on its face does not show that it is the only will of the decedent that therefore the will admitted to probate was a different will from the will mentioned by the proponent. Whatever there is in the point is quickly dispelled when one picks up the record and reads the further testimony given by the proponent. Immediately following the answer cited by the appellant the contestant interrupted, "Mr. Hall: That is the only will? A. In other words he stated it was the last handwriting that he would ever do. Mr. Donohue: I did not get that. A. He stated at the time he told me he made the will that it was the last handwriting he would ever do." At the time of the trial the appellant did not misunderstand the witness because in cross-examination appellant's counsel propounded the question, "Now, you said in your examination by Mr. Fulwider, that when your father made the will he stated that it was his only will, and the last writing he would ever do? A. That is right. Q. Were you present when he was writing this? A. No sir, he told me about it the day after he made it."

The last point made by the appellant in his opening brief is, "That the proponent did not sustain the burden of proof to support the finding that the will admitted to probate was the will of the deceased." Under this point the appellant makes two contentions. [3] He contends that the evidence does not show that the proponent was qualified to state whether the writing on the face of the will was the handwriting of the deceased. A sufficient answer to that contention is that when the question was propounded to the witness as to whose writing it was the witness was allowed to answer without any objection whatsoever. [4] As supporting the testimony given by the proponent he called as witnesses Joseph G. Morrow and Joseph A. Lombardi. In reply to questions propounded by the proponent Mr. Morrow testified that, "I am connected with the First National Bank of Santa Rosa and have been for about twenty-three years. During that time I have had considerable opportunity from time to time to judge of handwriting and compare signatures. It is a portion of my duties in the banking business to compare handwritings and to compare signatures and to decide from time to time whether signatures are what they purport to be." And then in reply to questions propounded by the contestant the witness testified: "Almost daily I have been called upon to examine handwritings in the bank. In the legitimate conduct of the affairs of the bank business I compare the handwriting of our customers with checks that they draw. I do not pretend to be an expert. I never testified as an expert on handwriting. I do not profess to be an expert. I am not an expert. I am not familiar with Sem Newell's signature." Thereupon the contestant objected to the witness testifying as to the signature of Sem Newell because the witness was not qualified. The trial court remarked, "Personally I think I would rather trust the testimony of a banker than the testimony of an expert for the reason that the banker makes it his business in life to compare signatures in paying out money, he depends on that knowledge, and I should think their evidence would be very valuable. . . . Moreover it has been the custom in our state to accept the testimony of banking men as a class, not only in this court, but in every court of this state. I think he is

qualified to testify." [5] Many courts of last resort agree with the trial judge and the reason for his conclusion. Digesting those decisions Professor Jones says: "Courts will take notice that certain pursuits are so intimately connected with others as to give those following one of such pursuits unusual facilities for becoming acquainted with the other; and if the occupation and experience of the witness have been such as to give him the requisite means of knowledge of the subject, he may be competent as an expert, although engaged in some other occupation or even if he has abandoned the business to which the inquiry relates. . . . In order that a witness should be competent as an expert in respect to handwriting, it is not necessary that he should belong to any particular calling or profession. It is only necessary that the business opportunities and intelligence of the witness should be such as to enable him to have reasonable skill in judging of handwriting. While it is not necessary that the witness should have made the comparison of handwriting a specialty, it should appear that he has been engaged in some business which calls for frequent comparisons, and that he has in fact been in the habit for a length of time of making such comparisons." (Jones on Evidence, 3d ed., pp. 556, 861, 862.) It seems clear, therefore, that, although Mr. Morrow did not know that he was a writing expert, nevertheless, under the law, he was fully qualified as such. What has been said regarding Mr. Morrow applies equally to Mr. Lombardi. The trial court did not err in receiving their testimony. (Code Civ. Proc., sec. 1944.)

[6] In concluding his reply brief the appellant states that if we disagree with him in the legal proposition that no *prima facie* case had been made, that then this court order certified up to this court contestant's exhibits 3, 4, 5, and 6, exemplars of handwriting, and then that this court make the comparison. We would make the order if by so doing it would be of any benefit to the appellant. But it would not be. The question of determining who wrote the signature "Sem Newell" to the will was a question of fact. The very first witness on the stand testified that Sem Newell wrote it. There was therefore evidence in the record in favor of the respondent and against the contestant. The trial court made its findings

in favor of the respondent. If all of the exhibits were before this court and this court reached a different conclusion it would have no power to disturb the finding made by the trial court under the circumstances enumerated.

The judgment appealed from is affirmed.

Langdon, P. J., and Nourse, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 8, 1926.