[Crim. No. 2487.   First Dist., Div. One.   Apr. 27, 1948.]

THE  PEOPLE,  Respondent,  v.  THOMAS  W.  DANIELS
et al., Appellants.

Busick & Busick for Appellants.

Fred N. Howser, Attorney General, David K. Lener, Deputy Attorney General, Edmund G. Brown, District Attorney, and Norman Elkington, Assistant District Attorney for Respondent.

PETERS, P. J.—The defendants appeal from judgments of conviction based upon jury verdicts finding them both guilty of two counts of grand theft and one count of conspiracy to commit grand theft, and finding defendant Daniels guilty of two counts of forgery, that charge having been dismissed as to defendant O'Malley. Each defendant was also found to have suffered one prior conviction of a felony. In addition to appealing from the judgments of conviction, defendants appeal from the orders denying their motions for a new trial, and also attempt to appeal from the orders denying their motions in arrest of judgment. ■ The orders denying the motion in arrest of judgment are not appealable. (Pen. Code, § 1237; *People* v. *Martin*, 188 Cal. 281 [205 P. 121, 21 A.L.R. 1399]; *People* v. *Battilana*, 52 Cal.App.2d 685 [126 P.2d 923]; *People* v. *Dallas*, 42 Cal.App. 2d 596 [109 P.2d 409].) The appeals therefrom should be dismissed.

■ The appellants, without a statement or analysis of the evidence, contend that the evidence is insufficient to support the judgments of conviction, stating that they "will leave it in the lap of the Attorney General to point out where any such evidence lies." (App. Op. Brief, p. 25.) That is not a proper method of presenting the point. It is the duty of the appellant to show error, and that means he is under an affirmative duty in that respect. It is not proper to attempt to shift the burden upon the respondent, and the latter is under no duty to assume the burden of demonstrating that the judgments are supported in the absence of a proper attack upon them. In the present case the attorney general has seen fit to analyze the evidence, and appellants make no attempt in their reply brief to attack this analysis. Under such circumstances this court would be warranted in disregarding the point entirely. However, inasmuch as appellants raise and argue other points, and because an understanding of the evidence is necessary to understand those points, we will briefly review the evidence that demonstrates to a certainty that the judgments on all counts are supported by substantial and convincing evidence.

### The Facts

The prosecutrix, Louise Tresmontan, is an elderly widow who resides and has an interest in the lease of a small hotel in San Francisco. On June 24, 1946, Daniels called upon her and told her that he had some good news for her; that a certain defunct insurance company in which her husband had been a shareholder had been found to own some valuable oil lands in Kettleman Hills; that a court had ruled that a portion of these lands were to be awarded to the shareholders; that the properties were worth $80,000,000; that she was entitled to the share of her deceased husband; that she would have to pay him $75.30 for the expenses of a deed for her share; that she was not to consult a lawyer. She paid Daniels $75.30 by check. Some time later Daniels called upon her and gave her a deed to a certain Lot No. 24 in Kettleman Hills. That deed had been secured by O'Malley, under the assumed name of A. G. Stone, from one Mabel Carson, upon his promise, never performed, to convey to Mabel Carson some Texas oil royalties. When Daniels delivered the deed to Mrs. Tresmontan he told her that the Standard Oil Company would pay her $4,000 for the property. Several days later Daniels told her that he wanted something over $1,800 for the "expenses of the lot," but she refused to give it to him. Daniels told her that

he would send someone else around to see her. The next day defendant O'Malley visited her and told her that his name was Stone; that he represented the Standard Oil Company; that he had known her husband; that she would get at least $45,000 from the Standard Oil Company for the property. O'Malley must have been pretty convincing because that afternoon the prosecutrix and the two defendants went to her bank and she gave them a cashier's check for $1,807.20 payable to Daniels. During this visit O'Malley exhibited to the prosecutrix a check for $45,000 that he represented was that of the Standard Oil Company, telling the witness that it was for a person in Utah who had acquired oil lands in the Kettleman Hills area as a shareholder in the same insurance company in which her husband was a shareholder, and that he, as the agent of the Standard Oil Company, had purchased the land from her.

The next visit of appellants to the prosecutrix occurred about a week later. At that time they told her that the Standard Oil Company would pay her $30,000 for the land, but that the deal could not be closed until they were paid $3,765 for "expenses from the land and taxes." On August 14, 1946, the prosecutrix delivered to Daniels a cashier's check made out to his order in that amount. No check from the Standard Oil Company, or any other check, was ever delivered to her, but appellants delivered to her another deed to a fractional portion of Lot No. 24.

Some time later appellants exhibited to her a supposed check of the Standard Oil Company made out to her for $45,000 and she was told that for another $5,000 they would deliver this check to her. She then realized that she had been "fooled" and demanded her money back. Daniels told her that, if she would return the two deeds, the money would be returned. She offered to do so but, of course, never received back the money. The two grand theft charges embraced the receipts of $1,807.20 and the $3,765. The forgery counts against Daniels embraced the two deeds given to the prosecutrix, to both of which was signed the name of "Raymond Greer" as grantor, and both deeds bore the notarization of one Laura Hughes.

Inspector King of the Oakland Police Department testified that Mrs. Daniels first told him that "Greer" was a friend of her husband's and that she had taken Greer to the notary who was a friend of hers to have the deeds notarized. Later she told King that she had met Greer in a bar and that he was

unknown to her husband. Daniels told King that he had never heard of Greer or of A. G. Stone, the name under which O'Malley secured Lot No. 24 from Mrs. Carson. Later King again questioned Daniels about his activities in approaching shareholders of defunct insurance companies and telling them that by making payments of taxes and expenses to him they would be entitled to share in the oil lands of such companies. King told Daniels that he knew that Daniels possessed a so-called "sucker list" of such shareholders. He also told Daniels that he knew that Mrs. Daniels had taken either Daniels or O'Malley to Laura Hughes and got her to notarize the deeds under the name of "Raymond Greer." Daniels then told King that his wife had nothing to do with the deal and was innocent; that his wife at his request took the deeds to the notary after they had been signed "Raymond Greer" and that the notary accommodated his wife because she was an old friend. Daniels also admitted to King that he received mail in San Francisco in two places under the name of "Raymond Greer." Some time later Daniels told King that he had first met O'Malley in April or May, 1946; that he, Daniels, had told O'Malley that he had the "sucker list" of stockholders in the insurance company; that if they could get hold of some oil land they could "use" the "sucker list" together; that the two of them had gone to the recorder's office in Fresno to look into the titles of land in the Kettleman Hills district; that they then found that Mabel Carson owned Lot No. 24 in that area; that O'Malley had got in touch with Mrs. Carson in Oakland; that when O'Malley returned from his visit to Mrs. Carson he not only had the deed to Lot No. 24, but also a deed from her to ten acres of land in Kern County; that O'Malley had exhibited to the prosecutrix what purported to be a Standard Oil Company check for $45,000.

Inspector King also testified that in his opinion the signatures of "Raymond Greer" on both deeds given to the prosecutrix were in the handwriting of Daniels. He based this conclusion on a comparison of the signatures on the two deeds with exemplars of Daniels' handwriting. The officer testified that he had worked "in the check detail" and had "general police experience in examining documents," and that "on the Bunco Detail we have occasion to compare handwriting." A handwriting expert called by Daniels gave it as his opinion that the handwriting on the deeds was not that of Daniels.

An officer of the Standard Oil Company of California testified that he had examined the company records back as far as 1933 and that from that date to the date of trial no Marvin M. O'Malley and no A. G. Stone had been employed by the company; that his company at no period here relevant owned land in the section in which Lot No. 24 is located; that his company had never attempted to buy Lot No. 24; that the photostat of the check exhibited by appellants to the prosecutrix was not a photostat of a check issued by his company.

Mabel Carson was called as a witness for the prosecution. On this appeal appellants urge that her testimony and that of the next witness to be discussed, Marianne Hook, related to prior and unrelated offenses and that the admission of such evidence was prejudicially erroneous. Mrs. Carson testified that since 1938 she and her daughter owned Lot No. 24 as joint tenants; that her daughter also owned 10 acres of land in Kern County; that in May, 1946, O'Malley called upon her in Oakland stating that his name was A. G. Stone and represented that he was associated with the legal firm of Greer & Greer in Los Angeles; that he wanted to secure Lot No. 24 and the 10 acres owned by her daughter; that he induced her and her daughter to convey Lot No. 24 and the ten acres to Raymond Greer on O'Malley's promise, under the alias A. G. Stone; that he would transfer to them certain oil royalties in Texas land. The transfer of royalties was never made, the Standard Oil Company was never interested in these lands, and no insurance company ever owned these lands. Lot No. 24 had an assessed valuation of $50. It should be here mentioned that counsel for neither appellant, who were separately represented at the trial, ever objected to her testimony on the ground that it covered inadmissible prior offenses.

This is not true of the testimony of Marianne Hook. As to her testimony objection was made on the inadmissibility of prior offenses ground. She testified that in the spring of 1946 O'Malley came to the ranch occupied by her and her husband, told them he was A. G. Stone and that he was an attorney representing Raymond Greer. He then made certain other representations and induced the Hooks to purchase from "Raymond Greer" as grantor the 10 acres of land which he had induced the daughter of Mrs. Carson to convey to "Greer." The Hooks gave O'Malley a total of $610, purportedly to pay off taxes, assessments, etc., which O'Malley

represented were against the land. O'Malley also told the Hooks, as an inducement to the purchase, that the Union Oil Company wanted to lease the land, and he exhibited what purported to be a check of that company to the Hooks for $3,000, representing that the company would pay that for the lease. The Union Oil Company had no desire to lease the ten acres, and A. G. Stone was not connected with that company. Daniels was not present during any of the O'Malley-Hook transactions.

Both defendants testified on their own behalf and contradicted most of the prosecution's evidence. Such evidence merely created a conflict with that of the prosecution.

### Contentions of Appellants

Appellants, as already pointed out, contend that the evidence is insufficient to support the judgments, and that the evidence of Carson and Marianne Hook was erroneously admitted because, so it is urged, it disclosed unrelated and separate offenses. It is also urged that both appellants were denied their constitutional and statutory right to be present at all stages of their trials.

### Sufficiency of the Evidence

The brief résumé of the evidence already given demonstrates beyond doubt that the guilty verdicts on all counts are amply supported. ■ Money taken from another upon false representations or false pretenses, of course, constitutes theft. (*People* v. *Selk*, 46 Cal.App.2d 140 [115 P.2d 607] ; *People* v. *Cook*, 10 Cal.App.2d 54 [51 P.2d 169].) ■ Here the defendants, acting together, induced the prosecutrix to deliver to them over $5,500 for two deeds to Lot No. 24, which lot was assessed at $50. They falsely represented that this lot was part of a large area owned by a defunct insurance company; that she was entitled to share in those lands under a court order; that she could secure her interest by paying off certain charges against the land; and that the total area was worth $80,000,000. Daniels further told her, falsely, that the Standard Oil Company would pay her $45,000 for her interest, and exhibited to her a forged check in that amount. The grantor of the two deeds to prosecutrix was a fictitious person. Daniels confessed most of the details of the plot to Inspector King. It is obvious that the two theft counts are amply supported.

The conspiracy count is also clearly supported. ■ A conspiracy, of course, need not be established by proof of an

express conspiracy agreement—it is sufficient if the existence of such conspiracy can be reasonably deduced from the facts and circumstances proved. (*People* v. *Bucchierre*, 57 Cal.App. 2d 153 [134 P.2d 505] ; *People* v. *Yant*, 26 Cal.App.2d 725 [80 P.2d 506] ; *People* v. *Dal Porto*, 17 Cal.App.2d 755 [62 P.2d 1061, 63 P.2d 1199].) ▮ The evidence clearly establishes the participation of both defendants in procuring the checks from the prosecutrix. Daniels' participation is obvious. O'Malley, as part of the fraud, procured Lot No. 24 from Mabel Carson and her daughter, and had it transferred to "Raymond Greer," an alias of Daniels. When the prosecutrix was doubtful about making the last payment to Daniels he produced O'Malley, masquerading as an employee of the Standard Oil Company, and O'Malley exhibited the $45,000 forged Standard Oil Company check. The two defendants went to Fresno and investigated the titles in the Kettleman Hills area, in order to get "bait" to feed their "sucker list." The two defendants accompanied the prosecutrix to the bank when she secured the last cashier's check. Later the two defendants demanded of her an additional $5,000. That such evidence supports the inference that these various overt acts were performed pursuant to an illegal agreement constituting a conspiracy is not only reasonable but inevitable under the facts.

▮ The verdicts finding Daniels guilty of forging the two deeds are also supported. Under section 470 of the Penal Code "Every person who, with intent to defraud, signs the name of another person, or of a fictitious person, knowing that he has no authority so to do, to . . . any . . . deed . . . or . . . passes, or attempts to pass, as true or genuine, any of the above named false . . . forged . . . matters, . . . with intent to defraud, . . . is guilty of forgery." The evidence shows that Daniels adopted, with intent to defraud, the alias of "Raymond Greer," and Inspector King testified that, in his opinion, Daniels had signed the name of Raymond Greer to both deeds. Moreover, the deeds, and exemplars of Daniels' handwriting, were introduced into evidence and exhibited to the jury. The testimony of Daniels' expert that Daniels did not sign the deeds merely created a conflict. The members of the jury were entitled to exercise their own judgment on this issue. (See cases collected 10 Cal.Jur. p. 1009, § 267.) Moreover, if expert testimony were necessary on this issue, which it was not, Inspector King qualified as such an expert.

▮ It is the law of this state that in order to qualify as an expert on handwriting it is not necessary that the witness

follow the profession of handwriting expert—it is only necessary that in the particular calling he does follow he is called upon to make frequent comparisons of handwriting. (*Estate of Newell*, 75 Cal.App. 554 [243 P. 33].) Inspector King clearly qualified as an expert under such rule.

### Evidence of Other Offenses

Appellants urge that it was error of a most prejudicial nature to have admitted the testimony of Mabel Carson and Marianne Hook concerning their transactions with O'Malley then masquerading under the alias of A. G. Stone, it being contended that such evidence disclosed the commission of offenses completely independent of the offenses charged. ▰ It is the general rule that a defendant can be tried only for the offenses charged, and that evidence of other independent crimes that has no tendency to prove a material fact involved in the crime charged is inadmissible. (See cases collected 8 Cal.Jur. p. 58, § 167.) To that rule there are several exceptions as well settled as the rule itself. One such exception "is that evidence of other crimes is admissible to show a pattern, scheme, design, project or plan of which the two crimes are a part." (*People* v. *Cassandras*, 83 Cal.App.2d 272, 279 [188 P.2d 546]; see, also, *People* v. *Peete*, 28 Cal.2d 306 [169 P.2d 924], cert. denied 329 U.S. 790 [67 S.Ct. 356, 490, 91 L.Ed. 677]; note, 35 Cal.L.Rev. 131.) The rule, supported by many authorities, is thus stated in 8 California Jurisprudence page 69, section 173: "Where several crimes are connected as part of one scheme or plan, all of the same general character, and tending to the same common end, they may be given in evidence to show the process or motive and design leading up to the particular crime for which the prisoner is being tried, and thus directly tending to show logically that the crime in question was a part of such common scheme. If the general crimes are part of a chain of cause and in consequence so linked as to be necessarily connected with the system or general plan, they are admissible."

▰ That the challenged evidence falls directly within this exception to the rule is too clear to require extended comment. The evidence already summarized shows that the dealings with Carson and Hook were part of a scheme to acquire lands near to proven oil lands in order to use such lands to defraud persons such as prosecutrix by recalling to them these lands on the representations falsely made that they were entitled to share in these lands, that they were very valuable,

and that the oil company was willing to pay a huge sum for them. The "Hook" transaction was identical with the "Tresmontan" transaction, except that O'Malley represented an affiliation with the Union Oil Company instead of the Standard Oil Company, and exhibited a forged check for $4,000 to tempt the Hooks instead of $45,000, as was used on the prosecutrix. The case of *People* v. *Cassandras, supra,* p. 279 lays down the following test for the admission of such testimony: "So far as this particular exception is concerned the evidence must be restricted to other acts with a sufficiently high degree of common features with the act charged to warrant the inference that if the defendant committed the other acts he probably committed the act charged." The "Hook" transaction meets this test.

That evidence of the "Carson" transaction likewise falls within this exception is equally clear. The testimony of Mrs. Carson relating to the circumstances of the acquisition of Lot No. 24 by appellants demonstrated that that transaction was part and parcel of the scheme to defraud the prosecutrix. That testimony showed, among other things, that the land was not part of the assets of a defunct insurance corporation, as represented, and that the prosecutrix was not entitled to a part of such lands pursuant to a court order, as represented. Such evidence directly proved material facts in connection with the crime charged—i. e., the falsity of the representations. The "Carson" transaction was not an independent, unrelated offense, but, in reality, a part of the offenses charged.

*Were Appellants Denied Their Constitutional and Statutory Rights to Be Present at All Stages of Their Trials?*

The Constitution of California, article I, section 13, provides in part, that: "In criminal prosecutions, in any court whatever, the party accused shall have the right . . . to appear and defend, in person and with counsel." Section 1043 of the Penal Code provides in part: "If the prosecution be for a felony, the defendant must be personally present at the trial." Section 1181 of the Penal Code in enumerating the reasons for which a new trial may be granted upon application of the defendant, provides in subd. 1: "When the trial has been had in his absence, if the indictment is for a felony." Appellants contend that the record shows that they were not present on one occasion when the causes were transferred from one department of the superior court to another, and

contend that such action, in their absence, violated their constitutional and statutory rights.

The clerk's transcript discloses the following: On March 5, 1947, the defendants being present with counsel, Judge Cronin of the trial bench denied a motion to dismiss certain counts of the indictment made by defendant Daniels, and granted the motion to dismiss the forgery counts against O'Malley, accepted defendants' pleas of not guilty, and by consent of all concerned ordered the cause set for trial on Tuesday, April 15, 1947. The minutes then disclose that on March 24, 1947, the matter again came before Judge Cronin, ex parte, "having been advanced by order of court, from the calendar of April 15, 1947.

"The District Attorney, with counsel for defendants, and without the defendants, answered present.

"Thereupon the court made an order transferring the above entitled cause to Department Extra Sessions No. Three (3), of the Superior Court to be set and for further proceedings." That department was then presided over by Judge Shoemaker before whom the causes proceeded to trial on April 15, 1947.

The appellants urge that the hearing of the motion to transfer their trials to another department and the order made thereon, was an integral part of their "trials" as that term is used in the constitutional and statutory provisions above quoted, that their absence on that day denied to them their constitutional and statutory rights as therein defined, and *ipso facto* requires a reversal. In addition, they further contend that they were prejudiced by the order in question (although they conceive prejudice to be a totally unnecessary foundation for their contention) because, so they state in their briefs, they would have objected being tried before Judge Shoemaker because he was prejudiced against them. They make this assertion of prejudice in spite of the fact that neither prior to nor during the trial did they object to Judge Shoemaker trying the cases, nor did they contend before the trial court that he was prejudiced.

In support of their contention that the hearing of such a motion is part of their "trial" as that term is used in the above constitutional and statutory provisions, appellants cite a number of cases, mainly from other jurisdictions, which contain general language to the effect that the word "trial" embraces every step taken by the trial court from the time the indictment is presented to the court up to and including the

final judgment. (*State* v. *Barrington,* 198 Mo. 23 [95 S.W. 235]; *State* v. *Hudson,* 55 R.I. 141 [179 A. 130, 100 A.L.R. 313]; *Molen* v. *Denning & Clark Livestock Co.,* 56 Idaho 57 [50 P.2d 9]; *State* v. *Spotted Hawk,* 22 Mont. 33 [55 P. 1026]; see, also, *People* v. *McKamy,* 168 Cal. 531 [143 P. 752].)

We have no quarrel with the rule announced in these cases. We have grave doubts, however, that the drafters of the Constitution and of the Penal Code ever intended in using the word "trial," to mean that it is error not to have a charged felon physically present during the making of every preliminary motion and order considered and passed upon by the trial court in his case, where no prejudice is shown. In *People* v. *O'Brien,* 88 Cal. 483 [26 P. 362], the Supreme Court affirmed a judgment of conviction and order denying a motion for a new trial in a case in which, as stated in the opinion, (p. 490) "O'Brien's trial was continued when he was not present in court." Nevertheless, the court held that the affidavit filed on the motion for a new trial "fails to show that the trial . . . was had in his absence, and therefore fails to show any ground for a new trial." (P. 490.) If "continuing" the trial when the defendant is not present is not error, it would seem obvious that transferring the case from one department to another under like circumstances is not error.

However, even if it be conceded that it was error in the present case to have transferred the case from one department to another in the absence of defendant, such error would not, under article VI, section 4½, of the Constitution, require a reversal unless prejudice is shown. This was the law even before article VI, section 4½, was adopted. In the early case of *People* v. *Miller,* 33 Cal. 99, decided under the Criminal Practice Act, the court affirmed a conviction and an order denying a motion for a new trial, and in doing so stated (p. 100): "The statute provides that . . . a verdict rendered against a defendant in such case when the trial has been had in his absence will be set aside upon motion for new trial. . . . The trial was not had in the defendant's absence. She does not claim that she was absent except at the time when the jury came into Court and announced their verdict and while the same was being recorded by the Clerk. . . . It is not pretended she was in any manner prejudiced in respect to a substantial right by reason of her momentary absence; and, assuming that she was absent as claimed on her behalf, and that the proceeding which transpired during that interval was irregular, it must be held to be an error or mistake of no

injurious consequence to the defendant, and in no wise rendering the verdict invalid."

The same rule was stated in *People* v. *Erwin*, 4 Cal.App. 394, 396 [88 P. 371], where it was stated: "We perceive no prejudicial error in the action of the court, on the third day of March, 1906, setting the case for trial on the 12th of April following, although such action was taken in the absence of the defendant, yet in the presence of his counsel. There was ample time for defendant to prepare for trial, and when the case was called for trial, if he had any objections to the time or manner of the setting of the cause, the same should have been offered. No objections were interposed."

In *People* v. *Rader*, 136 Cal. 253 [68 P. 707], the court indicated that it might have been error to have set a case for trial in the absence of the defendant and his counsel, but stated (p. 256) : "But the defendant did not object when the case was called for trial, and it does not appear that he was prejudiced in the least by the resetting of the case."

All of the above cases were decided before the adoption of article VI, section 4½, to our Constitution as originally adopted in 1911. Since that date there can be no doubt that errors, even in denying a constitutional right, do not necessitate a reversal unless prejudice is shown or is presumed. It has been so held in reference to the very section of the Constitution here involved—article I, section 13. That section, in addition to guaranteeing the right of one accused of a felony to be present in person and by counsel, also guarantees the right of such a defendant to be free from being required to be a witness against himself. In *People* v. *O'Bryan*, 165 Cal. 55 [130 P. 1042], the trial court erroneously admitted evidence of defendant's admissions before the grand jury made before the defendant had been warned of his constitutional right to refuse to testify. The Supreme Court held that such evidence had been admitted in violation of the constitutional provision in question, but also held that such error, in the absence of prejudice, did not require a reversal. In this connection the court stated (p. 65) :

"Section 4-½ of Article VI of our Constitution must be given at least the effect of abrogating the old rule that prejudice is presumed from any error of law. Where error is shown it is the duty of the court to examine the evidence and ascertain from such examination whether the error did or did not in fact work any injury. The mere fact of error does not make out a *prima facie* case for reversal which must be

overcome by a clear showing that no injury could have resulted.

". . . if a court should undertake to deny to a defendant charged with a felony the right of trial by jury, and after a hearing of the evidence render a judgment of conviction, it cannot be doubted that such judgment should be set aside even though there had been the clearest proof of guilt. Or, if a defendant, after having been once acquitted, should be again brought to trial and thereupon convicted, in disregard of his plea that he had been once in jeopardy, it would hardly be suggested that because he was in fact guilty, no 'miscarriage of justice' had occurred.

"But it does not follow that every invasion of even a constitutional right necessarily requires a reversal. It may well be that the court, after examining the 'entire cause including the evidence,' is of the opinion that the error complained of, whatever its character, has not resulted in a miscarriage of justice. The mere fact that the assignment of error is based upon a provision of the Constitution is not conclusive. The final test is the opinion of the appellate court upon the result of the error . . .

"The application of these views requires an affirmance of the judgment and order under review, notwithstanding our conclusion, as already stated, that the statements of the appellant to the grand jury should not have been allowed to go to the jury."

As late as the case of *People* v. *Isby,* 30 Cal.2d 879 [186 P.2d 405], decided in November, 1947, our Supreme Court, in discussing this question of a defendant's constitutional right to be present at all stages of the proceeding, stated (p. 893) : "Defendants rely on the well-settled rule that if the prosecution be for a felony, the accused must be personally present at the trial to validate a conviction. [Citing authorities.] Accordingly, it has been held in this state, as defendants properly note, that in the trial of a felony the accused must be personally present during the presentation of evidence before the jury [citing a case], or when the verdict is returned [citing cases]. And as further illustration of the rule, defendants cite cases holding that the accused was entitled to a new trial where it appeared that in his absence his objection to the introduction of evidence [citing a case], or his motion to exclude evidence [citing a case] was argued by the attorneys and decided against him by the judge. But in such instances the required presence of the accused bore a relation, reasonably substantial, to the fullness of his opportunity to protect

himself on the criminal charge. In considering this point in relation to the constitutional guaranty of due process, Mr. Justice Cardozo in the case of *Snyder* v. *Massachusetts,* 291 U.S. 97 [54 S.Ct. 330, 78 L.Ed. 674, 90 A.L.R. 575], aptly observed at pages 106-108: 'Nowhere in the decisions of this court is there a dictum, and still less a ruling, that the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow . . . [Rather] the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.' Thus, it is not necessary for a defendant to be present at proceedings which are merely preliminary or formal and at which matters affecting his guilt are not presented. [Citing authorities.] The determinative question is whether or not the accused suffered any damage by reason of absence at a particular stage of the proceedings.''

Tested by these standards it is quite clear that, even if it be assumed that error was committed in transferring the case in the absence of appellants, such assumed error could not have been prejudicial. The evidence demonstrates, beyond reasonable doubt, that appellants were guilty. ■ So far as the contention, first made in their briefs is concerned, that if they had been present they would have objected to Judge Shoemaker because he was prejudiced against them, but little need be said. Appellants, prior, at and during the trial, had ample time to challenge the qualifications of the trial judge. Appellants did not see fit to raise this point until after they had been convicted. At no time before, at or during the trial did they challenge the propriety of the transfer order made in their absence, nor did they, during such periods, make any charge of bias or prejudice against the trial judge. Under these circumstances it is obvious that the present contention is but an afterthought arrived at only after the jury properly had convicted them.

The appeals from the orders denying the motions in arrest of judgment are dismissed; the orders denying the motions for new trials and the judgments of conviction are affirmed.

Ward, J., and Bray, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 24, 1948. Carter, J., voted for a hearing.