[Crim. No. 7423. In Bank. June 3, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. GEORGE W. BOSTICK, WILLIAM ALFRED DAVIS, JR., CLARENCE PITTS and JIMMIE LAWSON, Defendants and Appellants.

B. T. Davis, Jr., Robert W. Stanley and Erling J. Hovden, Public Defender (Los Angeles), under appointment by the Supreme Court, James L. McCormick and J. Stanley Brill, Deputy Public Defenders, and Lee, La Vigne & Davis for Defendants and Appellants.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

PETERS, J.—Defendants George W. Bostick, William Alfred Davis, Jr., Clarence Pitts and Jimmie Lawson were charged with the murder of Oscar J. Williams, and with robbing Williams while armed with a deadly weapon. Bostick and Pitts were charged with and admitted two prior felony convictions. A jury found each guilty of murder in the first degree, guilty of the robbery, and of the charge of being armed at the time of the commission of the offense. On the penalty issue, the same jury imposed the death penalty on Bostick, and life imprisonment on his three codefendants. Motions for new trial were denied, Bostick's motion to reduce

the penalty was denied, and each of his codefendants was denied probation. Bostick's appeal is automatic (Pen. Code, § 1239). The appeals of Pitts, Lawson and Davis were taken over by this court in order to have the four appeals heard and decided together.

On May 28, 1964, we filed our opinion reversing the judgment imposing the death penalty on Bostick, and affirming the judgments in all other respects. On June 24, 1964, we granted a rehearing for the purpose of allowing the parties to be heard on the impact, if any, of the decision of the United States Supreme Court in the case of *Malloy* v. *Hogan,* 378 U.S. 1 [84 S.Ct. 1489, 12 L.Ed.2d 653], which decision was filed subsequent to our original opinion herein, and which touched upon a constitutional question raised by these defendants in their original briefs on appeal. *Malloy* held that the Fifth Amendment privilege against self-incrimination is available to a defendant in a state court, via the Fourteenth Amendment. The defendants here had claimed (and we had disallowed the contention) that the issue presented in *Malloy* (then pending) required reversal of the long-established California rule that court and prosecutor may comment, to a limited degree, upon a defendant's failure to testify in a criminal proceeding.

Subsequently we requested all counsel to investigate and argue the possible relevancy of the rules announced by the United States Supreme Court in two additional decisions filed on June 22, 1964 (two days before we granted the rehearing herein). In *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], the higher court ruled that confessions obtained by the police from an accused person who was denied opportunity to consult with counsel, and who was not warned of his constitutional right to remain silent, were inadmissible at trial. *Jackson* v. *Denno,* 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908], held invalid certain procedures in the determination of the allegedly involuntary nature of extrajudicial confessions. Thus, the following three new questions were presented: (1) Did the comment of the court and the prosecuting attorney regarding the failure of the several defendants to testify, violate defendants' privilege against self-incrimination? (2) Did the manner in which any of defendants' confessions were obtained render them inadmissible under the rule of *Escobedo*? (3) Did the manner in which the trial court determined the allegedly involuntary nature of such confessions violate the rule of *Jackson*? This last

issue need not be passed on because we have determined, for reasons hereafter set forth, that the judgment of guilt as to each defendant must be reversed for a violation of the rules set forth in *Escobedo, supra.*

*Comment on defendants' failure to testify:*

Although Davis and Lawson each testified on *voir dire* as to the allegedly involuntary nature of their extrajudicial confessions, and all defendants testified during the penalty phase of the trial, no defendant took the stand on the issue of his guilt. ▮ At the conclusion of the guilt phase of the trial the prosecutor argued, and the court instructed the jury, regarding the legal effect of that failure to testify. It is not urged that such comment or instruction went beyond the limits of the rules expressed in *People* v. *Adamson*, 27 Cal.2d 478 [165 P.2d 3], and affirmed in *Adamson* v. *California*, 332 U.S. 46 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223]. Defendants do contend, however, that both *Adamson* decisions were impliedly overruled by *Malloy.* This position has been affirmed by the United States Supreme Court, which recently held that our comment rule violates the Fifth Amendment privilege against self-incrimination (*Griffin* v. *California*, 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106]*). It follows, therefore, that the comment of the prosecutor and the trial court's instruction herein each constituted error. ▮ That portion of section 13 of article I of the California Constitution which purports to authorize such comment must bow to the superior mandates of the Fifth and Fourteenth Amendments to the United States Constitution.

▮ Such error, unless it resulted in a miscarriage of justice, does not, however, automatically require a reversal if article VI, section 4½, of our Constitution is applicable to it. We are of the opinion that such section is applicable.

The contention that the section is not applicable to errors involving due process under the Fourteenth Amendment finds some support in language to that effect in such cases as *People* v. *Kiihoa*, 53 Cal.2d 748, 752 [3 Cal.Rptr. 1, 349 P.2d 673] ; *People* v. *Modesto*, 59 Cal.2d 722 [31 Cal.Rptr. 225, 382 P.2d 33] ; *People* v. *Muza*, 178 Cal.App.2d 901 [3 Cal.Rptr. 395] ; and in Witkin, California Criminal Procedure (1963) 733-734. Such federal decisions as *Rogers* v. *Richmond*, 365 U. S. 534 [81 S.Ct. 735, 5 L.Ed.2d 760] ; *Jackson* v. *Denno, supra*, 378 U.S. 368, and similar cases dealing with the admis-

---

*Filed April 28, 1965.

sion of involuntary confessions also give some support to this contention. The language of these and other authorities, when separated from the problem there under discussion, appears to support the proposition that whenever the error is predicated upon constitutional grounds including a denial of due process under the Fourteenth Amendment it is reversible per se, and the resulting judgment is not saved by the fact that the error was not prejudicial. However, when such authorities are viewed together with those which have failed to reverse in the presence of acknowledged constitutional error, it becomes apparent that those requiring reversal per se were either cases dealing with the erroneous admission of confessions or cases in which the trial was fundamentally unfair. (See, e.g., *People* v. *McKay*, 37 Cal.2d 792, 798 [236 P.2d 145].) Other authorities (both federal and state) indicate that in many other situations the courts have held error which constituted a denial of due process or a violation of some other constitutional right to have been nonprejudicial and hence nonreversible. (*Fahy* v. *Connecticut*, 375 U.S. 85 [84 S.Ct. 229, 11 L.Ed.2d 171].)

There is nothing in *Malloy* or *Griffin* that suggests that the highest federal court considers every violation of due process to be prejudicial per se. Many prior decisions of the United States Supreme Court indicate that it will not reverse for every acknowledged constitutional error, some of which dealt with error of the type alleged herein.

In *Johnson* v. *United States*, 318 U.S. 189 [63 S.Ct. 549, 87 L.Ed. 704], the court held that comment on the defendant's reliance on his privilege against self-incrimination was error, but failed to reverse because the error had been waived. That was not tantamount to affirmance because the error was nonprejudicial, but indicates that denial of due process is not always reversible per se.

In *Wilson* v. *United States*, 149 U.S. 60 [13 S.Ct. 765, 37 L.Ed. 650], the court reversed because of the prosecutor's comment on defendant's failure to take the stand as a witness. There the court held the comment to be error because of a federal statute requiring that no presumption shall be created against defendant by reason of his decision not to testify, and therefore was not required to rely on the constitutional provisions. However, the following language (at p. 70) is persuasive herein: "We do not see how this statute can be completely enforced, unless it be adopted as a rule of practice that such improper and forbidden reference by counsel for the prosecution shall be regarded as good ground for a new

trial *in all cases where the proofs of guilt are not so clear and conclusive that the court can say affirmatively the accused could not have been harmed from that cause.''* (Italics added.) While the closing clauses of the foregoing quotation may be less liberal than our *Watson* rule *(People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]), it conclusively demonstrates that, in the field of illegal comment, the United States Supreme Court has in the past been mindful of the fact that error may be nonreversible when the circumstances show it to be non-prejudicial. For similar reasoning by the lower federal courts, see *Coleman* v. *Denno* (D.C.S.D.N.Y. 1963) 223 F.Supp. 938, affirmed in *United States* v. *Denno* (2d Cir. 1964) 330 F.2d 441; *United States* v. *Di Carlo* (2d Cir. 1933) 64 F.2d 15.

Turning now to the California authorities, even more cause exists to adhere to the dictates of section 4½ of article VI of our state Constitution. Prior to the 1934 amendment authorizing comment on a defendant's failure to testify as a witness, such comment was violative of the defendant's constitutional privilege against self-incrimination. But, during that period, it was the uniform rule that such comment, although erroneous, did not require reversal if, under the circumstances of the case, it was not prejudicial. *(People* v. *Mayen,* 188 Cal. 237, 259 [205 P. 435, 24 A.L.R. 1383].)[1] A similar, although not identical issue was presented in *People* v. *O'Bryan,* 165 Cal. 55 [130 P. 1042], wherein the court held that defendant's previous testimony before the grand jury had not been voluntary, and for that reason it was error to allow evidence of that previous testimony to be produced at trial. However, conviction was affirmed on the ground that the error was not prejudicial.

Subsequent to the 1934 amendment authorizing comment on the defendant's failure to testify there was no cause for the courts to pass upon the prejudicial or nonprejudicial nature of a procedure which was no longer erroneous. However, the introduction of, or comment upon, defendant's previous testimony before the grand jury was presented on several occasions. In *People* v. *Kynette,* 15 Cal.2d 731, 749-751 [104 P.2d 794], it had been held that a defendant who had voluntarily testified before the grand jury as to some matters, but who had refused to answer other questions on

---

[1]Certain language contained in the *Mayen* opinion, going to an entirely different point, has recently been disapproved in *People* v. *Matteson,* 61 Cal.2d 446, 470 [39 Cal.Rptr. 1, 393 P.2d 161]. Such disapproval does not affect the matters here involved.

the ground of self-incrimination, and who voluntarily testified at his trial, might be impeached by cross-examination as to the inconsistency between his exculpatory testimony at trial and his alleged basis for claiming privilege before the grand jury. The opinion pointed out the limited purpose for which such evidence might be introduced. Shortly thereafter, a similar problem was presented in *People* v. *Montgomery,* 47 Cal.App.2d 1 [117 P.2d 437]. There the court was bound by *Kynette* to hold the introduction of the matters which transpired before the grand jury to have been admissible for the limited purpose of impeachment. However, the court found error in the fact that the prosecutor was allowed to comment on the evidence for the purpose of drawing the inference beyond that specific limitation. That error, however, was held to have been nonprejudicial, the court stating (at p. 21) that "it does not follow that every invasion of even a constitutional right necessarily requires a reversal, . . ." (Citing *People* v. *O'Bryan, supra,* 165 Cal. 55, 60.)

Erroneous denials of constitutional guaranties other than those arising out of the Fifth Amendment (but many which were held to have constituted a denial of due process) have consistently been held not to require reversal when not prejudicial. A few examples are set forth:

(a) Error arising out of the absence of defendant from a portion of the proceedings—*People* v. *Isby,* 30 Cal.2d 879, 894 [186 P.2d 405]; *People* v. *Daniels,* 85 Cal.App.2d 182, 195 [192 P.2d 788]; *People* v. *Miller,* 33 Cal. 99; *People* v. *Erwin,* 4 Cal.App. 394, 396 [88 P. 371]. (The last two were decided prior to the adoption of section 4½ of article VI.)

(b) Failure to inform defendant as to certain of his rights —*People* v. *O'Brien,* 88 Cal. 483, 489-490 [26 P. 362]. (*People* v. *Hillery, ante,* p. 692 [44 Cal.Rptr. 30, 401 P.2d 382].)

(c) Illegal search and seizure—*People* v. *Parham,* 60 Cal.2d 378 [33 Cal.Rptr. 497, 384 P.2d 1001], wherein it is said (at p. 386): "To require automatic reversal for such harmless error could not help but generate pressure to find that the unreasonable police conduct was lawful after all and thereby to undermine constitutional standards of police conduct to avoid needless retrial. . . . An exclusionary rule so rigidly administered could thereby defeat itself."

If the word "prosecution" is substituted for the word "police" where the latter twice appears in the quotation from *Parham,* the reasoning applies equally to improper comment on defendant's failure to take the stand.

It having been determined that the rule of article VI, section 4½, of the California Constitution is applicable to this situation, we would ordinarily pass on the factual question whether the comments did or did not cause a miscarriage of justice. But we need not do so here because the judgments must be reversed for other reasons set forth below. Therefore the error here, whether prejudicial or not, simply becomes an additional reason in support of the reversals.

*The extrajudicial admissions and confessions:*

The greater portion of the prosecution's case was presented through the testimony of police officers who identified two written confessions, various tape recordings of conversations had with the various defendants, or testified directly to the content of other unrecorded conversations. Each such conversation included one or more damaging admissions, and most included complete confessions, involving both the narrator and his codefendants. The question is whether or not these admissions and confessions fall within the orbit of *Escobedo.* Our review of the record convinces us that the rule of that case is here applicable.

From the testimony of the police officers in their *voir dire* examinations to determine whether the confessions were voluntary or involuntary, it is apparent that they knew the following facts, from independent sources, all before interrogating the first defendant.

Williams, the victim, was a member of the Intime Club (a Negro social club) where he had spent the night of October 4-5, 1962; he had gambled much of the night, and had prominently displayed his winnings which were estimated at well over $1,000; he was known to be in possession of that sum when he left the club a few minutes before 8 a.m. on the 5th; he was seen entering his parked car outside the club; at that time he was accosted by a male Negro wearing a red shirt or sweater, and carrying a pistol; the latter shot Williams to death, robbed him, and fled carrying the money and the pistol; a short time later a person answering the description of the killer (and wearing a red shirt or sweater) was seen in another part of Los Angeles in the company of two other male Negroes; the three were seen leaving an automobile identified shortly thereafter as having been borrowed by the defendant Lawson on the evening before the killing, and entering a second automobile (also described to the police); at that time the three were seen dividing a large sum of money; one of

them (answering the description of the defendant Davis) was seen hiding a pistol under the hood of the second car; they had in their possession a brown leather briefcase; later the same day Lawson and Davis were seen together in a car answering the description of the second automobile, and in possession of a large sum of money and a brown leather briefcase. Thus, before apprehending or interrogating any defendant, and all within a few hours of the commission of the crime, the police had a description of the killer and further knew that he had shared the proceeds of the robbery with Lawson and Davis, who were known to them by both name and address. Upon learning the identities of Lawson and Davis, the police apparently checked with witnesses at the Intime Club and learned that the two men were members and had been present during the period that Williams was displaying his winnings.[2]

With that information in their possession the police set about (by midafternoon of the 5th) to apprehend Lawson. While the police were still looking for him, at approximately 9 p.m. on the 5th (13 hours after the commission of the crime) he went voluntarily to the police station, where he was interrogated by two detective sergeants assigned to the case, assisted by a third officer. During the first portion of this conversation he denied all knowledge of the crime. According to their testimony, the officers told Lawson that they knew he was lying, and exhorted him to tell the truth. When he continued with his denials, one officer said to him, "Don't say you weren't there because we know you were there." Another said, "I told him ... that we had seen him—that witnesses had seen him in his wife's automobile. I told him that witnesses saw him get out of one of the cars and another man take a gun out and put it under the hood. . . . I told him again that he was lying. . . . I said, 'Why don't you tell us the truth? You're lying.' " A third officer testified that, "We listened to his story, and then I believe my partner ... stated that this is not true, that we had contrary evidence to his statement, and I believe I asked him why he didn't go on and tell us the truth, that what he's telling us is obviously not the truth, that we had witnesses that could put him in an automobile at that location and that we knew he was at the scene of this robbery wherein the man was killed. . . . *And then he related the story as to which we believed and it coincided with the information that we had as to this case."*

---

[2] At the time of interrogating the first defendant the officers were in possession of photographs of the various suspects (other than Bostick), obtained from a file which the club kept for identification of its members.

(Italics added.) The same officer also testified that before Lawson confessed, *"We accused him of the particular crime. ..."* (Italics added.) Thereupon, Lawson made a complete confession.

The foregoing interrogation lasted until approximately 11 p.m. It was not recorded. The officers made no notes of it. It was not offered in evidence, except on *voir dire* of the recorded conversation which immediately followed.

As soon as Lawson had made the confession referred to above, the officers requested him to repeat the same. At that point they turned on a recording device which, unknown to Lawson, was operated from another room. Thus, the confession was recorded on tape. That tape was introduced into evidence against Lawson, only, but over his objection that the confession was involuntary, and was played to the jurors who followed it on typewritten transcriptions which were stipulated to be correct. In that confession Lawson stated in substance: that on the evening of October 4th he and the defendant Davis went (in Davis' car) to the residence of Lawson's estranged wife, where they left Davis' car and borrowed that of Mrs. Lawson; that they then proceeded to the Intime Club where they watched Williams gamble and win a large sum of money; that toward the early morning hours the two of them discussed with the defendant Pitts (whose full name Lawson did not know, but whom he identified by description, and as a club member called "Sonny") the possibility of robbing Williams; that because Williams remained until daylight it became obvious that any one of the three would be recognized in attempting a holdup; that Pitts sugegsted that he knew another man who was not known to club members, and who would attempt a daylight robbery; that the three then drove in the Lawson car, to an address where Pitts picked up the fourth man; that Lawson did not learn the man's true name, but that the latter was introduced to him as "Diamond Sam"; that the man wore a red sweater; that the four then drove back to a point near the Intime Club, where they parked; that Pitts went into the club to see if Williams was still there; that when Williams came out he was pointed out to "Diamond Sam"; that the latter, carrying a pistol,[3] went to Williams' car while Lawson and Davis waited;

---

[3]Lawson did not, at this time, identify the pistol. Subsequent confessions indicated that after picking up "Diamond Sam," the four had driven to Davis' car where the latter obtained the pistol from under the hood and gave it to the killer. It was returned to its hiding place at the time the cars were exchanged.

that when they heard pistol shots, they turned the car around and started to leave; that "Diamond Sam" caught up with them, when the engine died, and got in; that he had the pistol in one hand and what appeared to be Williams' pocket, with the money in it, in the other; that he said he had fired the shots into the air in order to frighten the victim; that they drove back to Mrs. Lawson's residence where they changed to Davis' car; that they then divided the money and drove "Diamond Sam" downtown; that he (Lawson) later learned (from Davis, who had heard it over the radio) that Williams had been killed.

After obtaining the foregoing confession, the police took Lawson (during the early hours of October 6th) in a squad car for the purpose of having him show them the respective residences of Davis and "Diamond Sam." Davis was not at home, and an officer was left to pick him up on arrival. "Diamond Sam" was not at his residence, but there the police learned that his true name was George W. Bostick.

On returning to the station, the police requested that Lawson repeat his confession in writing. At first he refused on the ground that he wished to talk to an attorney before putting anything in writing. The police told him that he would be better off with a public defender, and the subject of an attorney was dropped.[4] However, he still refused to confess in writing on the ground that he did not wish to incriminate himself. The police then divulged to him the fact that his oral confession had been recorded, and that they had sufficient evidence to take his case to the district attorney. They told him that it would be helpful to him if he made a written confession, as it would show the trier of fact that he was cooperative. (Lawson testified, and the police denied, that the police advised that if he cooperated they would actually testify to that on his behalf.) However, they told him that they could not have any further time to give his case, and if he did not make a written confession at that time, it would be his last opportunity. At that, Lawson repeated his confession, in his own handwriting, and signed the same. The document was introduced in evidence, over his objection, but only as against him.

---

[4]This is the police version of the conversation. According to Lawson, the conversation regarding an attorney was the same, but took place during the unrecorded portion of the first interrogation, and before he made any confession. Both Lawson and the police agreed as to the substance of the balance of the conversation which took place immediately prior to the making of the written confession.

At 7 a.m. on October 6th Davis returned to his residence and was arrested by the officer who was there awaiting him. The arresting officer talked to him en route to the station, and after arrival there. He subsequently testified (over objection that the conversation was involuntary) that in such conversation Davis made a complete confession, substantially similar to that previously made by Lawson. However, his written report of arrest contained the statement that "Defendant denies knowledge of above incident." After interrogating Davis, the officer called the two detective sergeants assigned to the case, and the three again interrogated Davis. This conversation was recorded on tape, without Davis' knowledge, and was introduced in evidence (as against him only) over his objection that it was not made freely and voluntarily. One of the officers testified, on *voir dire*, that Davis at first refused to confess, but did so after being shown Lawson's written confession and pictures of some of the other defendants. The tape, as played in evidence, did not contain that portion of the conversation, and commenced in the middle of an unintelligible sentence. The balance was similar to the Lawson confession, except that it contained a better identification of defendant Pitts. It also contained a request by Davis to make a telephone call, which request was denied. However, that request may have been in connection with the whereabouts of the pistol, the ownership of which Davis admitted, rather than a call to an attorney.

Following Davis' confession, the officers took him to several places for the purpose of learning where he had disposed of the pistol and where he had secreted his share of the proceeds of the robbery.

At 1 p.m. of the same day that Davis confessed (and implicated Pitts) a police officer was sent to Pitts' residence where he arrested the latter. At the time of the arrest he had a conversation with Pitts, but did not testify to the content thereof except to say that it was substantially the same as the interrogation which followed at the station. There he and another officer interrogated Pitts and, without the latter's knowledge, had the conversation recorded. The result was a complete confession, similar in all respects to those of Lawson and Davis, except that: (1) Pitts was unable to name either Lawson or Davis except by their first names, but identified their photographs when shown the same by the police; (2) Pitts was able to supply Bostick's name, and offered to take the police to his residence; and (3) Pitts claimed that

after he went into the club to look for Williams he decided to withdraw from the conspiracy, but did nothing about communicating that decision to anyone. The tape of this interrogation, like those of the other defendants, did not commence at the beginning of the conversations, and contained unintelligible gaps in various places. It did show, however, that whenever Pitts indicated that he did not want to continue (which occurred several times), or when he made a statement which was contrary to the facts already learned by the police, the latter exhorted him to tell the truth and advised him that they already knew the facts by reason of his codefendants' previous statements. When the recording of his confession was offered in evidence Pitts was allowed an opportunity to examine witnesses on *voir dire,* to show (if he could) the involuntary nature of the same. However, the *voir dire* produced no evidence of that fact, and it cannot be said that Pitts offered any serious objection to introduction of the recording. It was played to the jury, who followed it (as they did the recordings of the conversations of the other defendants) on typewritten transcripts.

The recording showed that during the interrogation one of the police officers requested Pitts to make the confession in his own handwriting. Pitts refused on the ground that he did not want to incriminate himself, and was told by the police that he was not only already incriminated, but that the codefendants had said that he was the instigator of the whole affair. The latter statement is not strictly a true interpretation of the confessions of the other defendants. However, Pitts made no written confession.

At approximately 5 p.m. (about an hour after finishing Pitts' interrogation) Lawson, Davis and Pitts were jointly interrogated by police officers (this time including a captain of detectives). According to the officers' testimony, the purpose of this subsequent interrogation was to clear up minor discrepancies in the statements of the three defendants. Unknown to the defendants, the conversations were recorded on tape, and were introduced into evidence (played to the jury who were given typewritten transcripts) over defense objections that the accuseds' answers were neither free nor voluntary.

The next evening (October 7th, at 6 p.m.) Bostick was arrested, after which he was interviewed by two officers. That conversation was related by one of the officers, without objection by Bostick (although on the objection of the codefendants it was limited to Bostick only). The officer tes-

tified that Bostick first gave completely exculpatory answers to his questions, but subsequently (and without urging) made a complete confession that coincided with the stories of the other defendants except that it did not name the latter. On cross-examination of the officer Bostick's counsel attempted to show that the confession was involuntary, but was unable to obtain any such admission from the witness.

Although the confession so placed in evidence was not recorded, a second confession was obtained, and taped (without Bostick's knowledge) immediately thereafter. An objection was made to the introduction of that tape on the dual ground that it was not the best evidence, and that its introduction constituted undue emphasis in light of the introduction of the unrecorded confession. That objection was subsequently withdrawn. No objection was made as to the free and voluntary nature of the recorded confession. The tape was played while the jury followed typewritten transcripts which were stipulated to be true copies.

A few hours later (shortly after 9 p.m.) two other officers again interviewed Bostick and recorded the conversation. They obtained a third confession, substantially the same as Bostick's two former confessions, except that it contained conversation in which the police requested Bostick to make a written confession, in addition to those made orally. At this point the officers explained to Bostick the various degrees of murder and manslaughter, the possible penalties, and the advantages which might accrue to him if he cooperated with the police. At the conclusion of the oral conversation Bostick made a written confession, as requested. Bostick's counsel requested *voir dire* on the voluntary nature of both the recorded conversation and the written confession, and the same was had in the presence of the jury. At the conclusion thereof he offered no objection, and both the tape and the document were admitted into evidence (the tape in the same manner as those mentioned previously).

The next day (October 8th) three officers interviewed Pitts and Bostick jointly, while their conversations were being recorded on tape (again without defendants' knowledge). The alleged purpose was to clear up inconsistencies between their stories as given, but the inconsistencies, if any, were so minor as to be of no importance. The result of the interview was to obtain an oral recorded confession of each, made in the presence of the other. It was subsequently introduced into evidence in the same manner as the other recordings.

On October 17th one of the police went to Bostick's place of employment where he recovered a red sweater from the locker in which Bostick had stated (in his confessions) that he had placed it. On the 18th he brought that sweater to Bostick and requested that he identify it as the sweater worn during the commission of the crime. He subsequently testified that Bostick so identified the sweater.

From the foregoing it is apparent that the police obtained, and the prosecution placed in evidence, 13 separate confessions or admissions. These constituted: one recorded oral and one written statement by Lawson; one unrecorded oral and one recorded oral statement by Davis; one unrecorded and one recorded oral statement by Pitts; two unrecorded oral, two recorded oral and one written statement by Bostick; one recorded joint oral statement by Lawson, Davis and Pitts; and one recorded joint oral statement by Pitts and Bostick.

We turn now to the impropriety of the introduction of these 13 statements in evidence. Following the decision of the United States Supreme Court in *Escobedo* v. *Illinois, supra,* 378 U.S. 478, which extended the right to counsel to the pre-arraignment accusatory stage, we held in *People* v. *Dorado* (1965) *ante,* pp. 338, 353 [42 Cal.Rptr. 169, 398 P.2d 361], "that defendant's confession could not properly be introduced into evidence because (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights."

In *People* v. *Stewart* (1965) *ante,* pp. 571, 577 [43 Cal. Rptr. 201, 400 P.2d 97], in delineating the accusatory stage, or that stage when the right to counsel matures, we said, "Whenever the ... conditions are met, that is, when the officers have arrested the suspect and the officers have undertaken a process of interrogations that lends itself to eliciting incriminating statements, the accusatory or critical stage has been reached and the suspect is entitled to counsel."

From the facts set forth above, it is clear that each of the 13 statements introduced herein was obtained during the accusatory stage, without the defendants having been advised of their rights to remain silent and to counsel, or with the defendants having been affirmatively deprived of counsel.

All 13 of such statements have several things in common. Each was obtained while the defendants were under arrest, or its equivalent.[5] The place, the time and the manner of the interrogations,[6] and the questions asked,[7] as we have noted above, indicate that each of the statements was obtained during a process of interrogation that lent itself to eliciting incriminating statements. (*People* v. *Stewart, supra*, at p. 579.) No defendant was advised of his constitutional rights (the right to counsel or the right to remain silent) prior to eliciting his incriminating statements, nor is there any other evidence indicating that defendants otherwise waived those rights.[8] In fact, some (although not all) of the confessions were obtained after the defendant involved had requested counsel. Although in such instances the police denied that they refused to allow defendant to obtain counsel, they admitted that they effectively persuaded the defendant that such was unnecessary.

[5]All but Lawson had actually been arrested prior to interrogation. Although Lawson went to the police of his own volition, it was for the purpose of inquiring as to their purpose in seeking him. Since he first denied all knowledge of the crime, his voluntary submission was not for the purpose of confessing. The police then held him in custody until he confessed, and did not release him at any time thereafter. Thus, the circumstances of his custody were tantamount to arrest.

[6]As to Lawson, the police were already seeking his apprehension when he arrived at the station. They testified that they elicited his confession by pointing out to him that they already had sufficient evidence on which to convict him. They directly accused him of complicity. Once Lawson had confessed the police had sufficient information to focus on each of the other defendants, including Davis' name and both Davis' and Bostick's addresses. The subsequent confession of Davis completed the case against Pitts, and the latter's confession supplied any possible missing detail against Bostick. Obviously, the nine subsequent interrogations (following the first confession of each respective defendant) were made after the inquiry had focused on the defendant interrogated.

[7]The record indicates that the incriminating replies were in response to questions asked by the police. In many instances the latter told the defendant that they were seeking his cooperation in establishing their case against a codefendant. However, the questions were put in such language that an answer incriminating a codefendant would equally incriminate the defendant making reply.

[8]Because this case was tried prior to the existence of the authorities requiring such advice, no direct testimony was introduced on this point. However, we are able to deduce this fact from the further facts that the police testified that their taped recordings, supplemented by their testimony of unrecorded conversations, comprised everything that was included in their conversations with the defendants. Nothing therein even hints at a warning of constitutional rights, and much of it indicates a police desire to prevent defendants from gaining any knowledge thereof. We cannot presume from a silent record that such warnings were given or that defendants otherwise waived their rights. (*People* v. *Stewart, supra, ante*, pp. 571, 580-581.)

In addition to the foregoing factors common to all of the extrajudicial statements, many of the same indicate that several of the defendants not only denied all complicity before making any incriminatory admission or confession, but also stated that they did not wish to incriminate themselves. In each such instance, the respective defendant testified, on *voir dire,* that his incriminatory reply was obtained by threat of gas chamber or promise of reward in the form of police aid at the time of trial. Although the police denied this in their testimony, they frankly admitted that they persuaded the various defendants by pointing out that telling the truth (and implicating codefendants) would show cooperation with the police, and that such cooperation might win the lesser of the various stated punishments, or even an acquittal.

The facts of this case do not lend themselves to the claim that the balance of the evidence, sans the extrajudicial confessions, supplies overwhelming proof of the guilt of any one of the defendants, even if such contention would be permissible, which it is not (*People* v. *Dorado, supra, ante,* pp. 338, 356). Regardless of the police claim that they had such proof prior to interrogating Lawson, very little was offered at the trial other than the admissions and confessions of the various defendants. That little consisted of proof that a man resembling Bostick committed the crime, and that such a person was later seen dividing money with men resembling Lawson and Davis, and that the three were known to have been in possession of automobiles traceable to Lawson and Davis. No evidence, other than the confessions, connected Pitts with the crime. The improper introduction of defendants' extrajudicial statements compels reversal of the judgments of conviction against each of the defendants.

For the reasons stated above, we do not reach the question whether the allegedly involuntary nature of the several extrajudicial statements was properly determined in light of the *Jackson* decision. (*Jackson* v. *Denno, supra,* 378 U.S. 368.) Nor is it necessary to discuss any of the other points raised in the briefs.

The judgments are reversed and the causes are remanded for a new trial.

Traynor, C. J., Tobriner, J., Peek, J., and Dooling, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council·

SCHAUER, J.,* Concurring and Dissenting.—On the facts as recited in the majority opinion I would affirm the judgments as entered. The second sentence of that opinion states "Bostick and Pitts were charged with and admitted two prior felony convictions." As an essential prerequisite to such prior felony convictions it must be presumed that these defendants had been fully advised of their constitutional rights; they were, therefore, in the totality of the circumstances, not of a class governed by *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. Rather, they come within the rule preserved by Mr. Justice Goldberg in authoring the *Escobedo* majority opinion as follows:

"*Crooker* v. *California,* 357 U.S. 433 [78 S.Ct. 1287, 2 L.Ed.2d 1448], does not compel a contrary result. In that case the Court merely rejected the absolute rule sought by petitioner, that 'every state denial of a request to contact counsel [is] an infringement of the constitutional right *without regard to the circumstances of the case.*' *Id.,* at 440. (Emphasis in original.) In its place the following rule was announced:

" '[S]tate refusal of a request to engage counsel violates due process not only if the accused is deprived of counsel at trial on the merits, ... *but also if he is deprived of counsel for any part of the pretrial proceedings,* provided that he is so prejudiced thereby as to infect his subsequent trial with an absence of "that fundamental fairness essential to the very concept of justice...." ' The latter determination necessarily depends upon all the circumstances of the case.' 357 U.S. at 439-440. (Emphasis added.)

"The Court, applying 'these principles' to 'the sum total of the circumstances [there] during the time petitioner was without counsel,' *id.* at 440, concluded that he had not been fundamentally prejudiced by the denial of his request for counsel. Among the critical circumstances which distinguish that case from this one are that the petitioner there, but not here, was explicitly advised by the police of his constitutional right to remain silent and not to 'say anything' in response to the questions, *id.,* at 437, and that petitioner there, but not here, was a well-educated man who had studied criminal law while attending law school for a year." (*Escobedo* v. *Illinois* (1964) *supra,* 378 U.S. 478, 491-492.)

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

Surely acting as principals during the investigations, accusations, arraignments, pleas, trials, and convictions for two felonies each, should provide as much practical knowledge of police and court procedures, and of the constitutional rights of one accused of crime, as would the one year in a law school relied on in *Crooker*.

By compulsion of *Griffin* v. *California* (April 28, 1965, No. 202) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106], I concur with Mr. Justice Peters' discussion and conclusion that the comment of the prosecutor and the trial court's instructions relative to the failure of defendants to testify on the issue of guilt, constituted technical error; I further concur in holding that such error does not require (indeed, it would not support) reversal unless it has resulted in a miscarriage of justice. (Cal. Const., art. VI, §§ 4 and 4½). By the sole empowering grant of jurisdiction to this court, coupled with the specific limitation on exercise of that power (as set forth in the above cited sections of California's Constitution), we cannot reverse "unless, after an examination of the entire cause, including the evidence, [we] shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (See *People* v. *Watson* (1956) 46 Cal.2d 818, 834-838 [11, 12, 13] [299 P.2d 243].)

From the facts related in the majority opinion, it appears to me that the police had the subject crimes substantially solved before interrogating any defendant. At the times the statements were made by the defendants the police already knew in a comprehensive way whether their respective statements were true or false. Those statements, therefore, in the totality of the record are of relatively minor importance.

After examination of the entire cause, including the evidence, I am not of the opinion that a miscarriage of justice is indicated as to any defendant. It follows that the judgments should be affirmed.

McComb, J., concurred.